**INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL-CIO, Petitioner**

*v.*

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 15384.**

United States Court of Appeals District of Columbia Circuit.

Argued April 11, 1960.

Decided June 30, 1960.

---

Mr. Benjamin C. Sigal, Washington, D. C., with whom Mr. David S. Davidson, Washington, D. C., was on the brief, for petitioner.

Miss Fannie M. Boyls, Atty., National Labor Relations Board, with whom Messrs. Dominick L. Manoli, Associate General Counsel, National Labor Relations Board, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Re-

lations Board, were on the brief, for respondent.

Before PRETTYMAN, Chief Judge, and BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

The International Union of Electrical, Radio and Machine Workers ("I.U.E.") lost a representation election conducted by the National Labor Relations Board on September 6, 1957, among the 408 employees of NECO Electrical Products Corporation, at Bay Springs, Mississippi (population approximately 1300). Petitioner challenged the election on the ground that the Company had prevented a free choice. The regional director sustained this challenge and set the election aside. Petitioner thereupon filed charges against the Company alleging that it had violated § 8(a) (1) of the National Labor Relations Act[1] by the instigation of racial unrest; by surveillance and interrogation of employees; and by threats of plant closing, blacklisting and other economic reprisal. The general counsel issued a complaint which included all the Union's charges except the one based on racial unrest, which he dismissed.

At a hearing before the trial examiner, the Union moved to amend the complaint to include the racial charges. The examiner ruled that the Board was without power to overrule the general counsel since he "controls the complaint and limits the issues here." Upon conclusion of the hearing, the examiner found that the Company had violated the Act by threatening to shut down or move the plant if the Union won the election. The Board affirmed the examiner's rulings, without discussion, including the Union's motion to amend. 124 NLRB No. 54 (1959). It also sustained the examiner's findings, save one: it found that a supervisor's statement to an employee, predicting that if the plant were unionized various customers would cease doing business with the Company, did not illegally coerce or restrain employees.

The Union brings the instant petition to review the Board's action in (1) refusing to amend the complaint, and (2) in determining that the supervisor's statement did not violate § 8(a) (1).

*1. Charges concerning racial prejudice:* During the election campaign, NECO's president wrote a letter to its employees purporting to tell them *"what kind of an outfit the IUE is and what kind of men its leaders are."* It pointed to statements by Union leaders endorsing racial integration and asked, *"Is the I.U.E. attempting to organize you because it's interested in you or because it's interested in furthering its leaders' theories, which include integration?"* The letter also implied that I.U.E. leadership was largely composed of Communists. Enclosed in the letter were reproductions of pages from the Union's newspaper picturing and describing (1) a contribution which several northern I.U.E. locals had made to the National Association for the Advancement of Colored People; and (2) the participation of Union officials, including the I.U.E.'s president, in a Washington, D. C., rally commemorating the third anniversary of the Supreme Court's segregation decision.

The Union also offered to prove that, prior to the election, NECO posted throughout its plant reproductions of an inflammatory Mississippi newspaper article featuring a picture of the I.U.E.'s president dancing with a Negro "lady friend"—identified in the record as the

---

1. That section provides:
    "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title." [61 Stat. 140 (1947), 29 U.S.C.A. § 158(a) (1).]

"the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." [61 Stat. 140 (1947), 29 U.S.C.A. § 157.]

wife of a Nigerian official. Finally, the Company required its employees to attend a meeting held at the plant during working hours at which NECO's president heatedly accused the Union of being "nigger lovers." Perhaps somewhat superfluously, the Union offered expert testimony at the hearing, to show that the conduct attributed to the Union "goes against the accepted folkways" of Bay Springs, Mississippi, and that the Company's statement would therefore "tend to coerce the employees and to restrain them from assisting or joining the union" through the incitement of "social disapproval and possibly reprisals from the people in [their] community."

The general counsel did not give any reason for refusing to include in the complaint charges based upon this conduct. Whatever his reason, no party to this record has defended his action on the ground that the employer's conduct, if proved, would not constitute a violation of the Act.

Petitioner concedes that under § 3(d) the general counsel has discretion as to whether or not to *issue* a complaint. That section, enacted in 1947, provides that the general counsel "shall have final authority, on behalf of the Board, in respect of the investigation of charges and *issuance* of complaints under section 10, and in respect of the prosecution of such complaints before the Board * * *." [2] But petitioner contends that under § 10 (b) of the Act power to *amend* a complaint, once issued, lies with the Board and trial examiner. That section, part of the original Wagner Act, provides that a "complaint may be *amended* by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon." [3]

Petitioner asserts that the administrative determination *whether* to issue a complaint is controlled by such considerations as budget limitations, possibilities of settlement, and the importance of the challenged conduct,[4] and that such considerations have no bearing on *how far* to proceed once the administrative machinery is started. It also points out that the charging party has a most significant role to play in the process of determining an unfair labor practice. The charge of such party is a prerequisite to any investigation, and to the issuance of a complaint. Once a complaint issues, the general counsel cannot settle the case, and thus dispose of it without affording the charging party an opportunity for hearing, unless the charging party agrees.[5] During the hearing, the charging party can introduce evidence, call and cross-examine witnesses, and propound theories which the general counsel fails or refuses to rely upon. It can appeal the examiner's decision to the Board and can invoke judicial review of Board action even if the general counsel does not. Finally, petitioner argues that refusal to amend the complaint in this case was particularly anomalous since the violation alleged—restraint or coercion of employees under 8(a) (1)— was merely corroborative of other conduct in violation of the same section which the general counsel included in the complaint. Moreover, the racial prejudice testimony was in part admissible with respect to the other alleged acts of coercion to show the employer's "animus."

Were it not for the legislative history and judicial gloss upon § 3(d), we might be disposed to accept petitioner's distinction between "issuance" and "amendment" and hold that the Board's

---

2. 61 Stat. 139 (1947), 29 U.S.C.A. § 153 (d), emphasis supplied.

3. 61 Stat. 146 (1947), 29 U.S.C.A. § 160 (b), emphasis supplied.

4. See, e. g., Amalgamated Ass'n of Street, Electric Ry. and Motor Coach Employees, etc. v. National Labor Relations Board, 1956, 99 U.S.App.D.C. 177, 238 F.2d 38.

5. Marine Engineers' Beneficial Ass'n No. 13 v. National Labor Relations Board, 3 Cir., 202 F.2d 546, certiorari denied 1955, 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345.

power under § 10(b), to amend over opposition of the general counsel, was not obliterated by the later enactment of § 3(d).

The Office of General Counsel was created by the enactment of 1947. Prior thereto, the Board itself, like most administrative agencies, investigated charges, and issued, prosecuted, amended and adjudged complaints. This amalgamation of prosecuting and judicial functions generated much criticism. The Hartley Bill in the House of Representatives proposed to create a separate administrative agency, independent of the Board, and known as the "Office of the Administrator of the National Labor Relations Board."[6] The administrator was to investigate charges, issue complaints, and prosecute them before the Board, much as a district attorney presents a criminal case. The Board was only to decide cases, and supervise elections.

The Taft Bill, as it passed the Senate, made no changes in the Board's procedures for issuing and prosecuting complaints. In conference the bills were reconciled by the inclusion of what is now § 3(d). The conferees apparently intended to adopt the substance of the House proposals and weave them into the existing act in order to avoid the creation of a new and separate agency.[7] There is no doubt that Congress intended to make the general counsel's decision unreviewable by the Board. President Truman recognized this in his veto message, pointing out that the general counsel "might usurp the Board's responsibility for establishing policy under the act";[8] and numerous Senators and Representatives criticized the creation of a "labor czar."

In enacting § 3(d), Congress did not expressly abrogate the existing and apparently inconsistent provision of § 10(b) relating to amendment. According to familiar principles of statutory construction, we must seek to resolve this ambiguity in a manner which gives effect to the latest legislative expression and still leaves an area of effective operation for the earlier expression. This reconciliation does not require us to construe § 10(b) as empowering the Board to allow amendments which have been rejected by the general counsel. Section 10(b) may be read, for example, to empower the Board to disallow amendments to the complaint, requested or approved by the general counsel, in order to prevent surprise and prejudice to the charged party.

This resolution is harmonious with consistent judicial interpretation of the Act. In National Labor Relations Board v. Bar-Brook Mfg. Co., 5 Cir., 1953, 220 F.2d 832, the general counsel issued a complaint against the employer, charging illegal interference in the election. The employer attempted to "counterclaim," charging the Union with preelection violence. The general counsel refused to prosecute this charge, and the Board refused to consider it, claiming it was without jurisdiction unless the general counsel issued a complaint. The court affirmed.

National Labor Relations Board v. Sterling Furniture Co., 9 Cir., 1953, 202 F.2d 41, is not to the contrary. There the court reversed the Board's refusal to allow post-hearing amendment of the complaint. But the general counsel joined in the request for amendment.

Finally, this construction of the Act comports with the Board's own rulings that it lacks power to allow amendment of a complaint without consent of the

---

**6.** H.R. No. 3020, 80th Cong., 1st Sess. (1947). 1 N.L.R.B., Legislative History of the Labor-Management Relations Act of 1947 174 (1947) (hereafter cited as Legislative History).

**7.** Remarks of Representative Hartley, 93 Cong.Rec. 6442, 80th Cong., 1st Sess.

(1947), 1 Legislative History 883; Statement of Senator Taft, 93 Cong.Rec. 6383, 80th Cong., 1st Sess. (1947), 2 Legislative History 1538.

**8.** 93 Cong.Rec. 7487, 80th Cong., 1st Sess. (1947), 1 Legislative History 918.

general counsel. See Sailors' Union, 92 NLRB 547 (1950); Dallas Concrete, 102 NLRB 1292 (1953), enforced 5 Cir., 1954, 212 F.2d 98.

█ In concluding that the Board cannot entertain an amendment to the complaint which the general counsel opposes, we express no opinion on whether the general counsel's action, in refusing to include the racial charges in the complaint, is reviewable in an equity suit in the District Court. See Hourihan v. National Labor Relations Board, 1952, 91 U.S.App.D.C. 316, 201 F.2d 187, certiorari denied 1955, 345 U.S. 930, 73 S. Ct. 792, 97 L.Ed. 1359; Bandlow v. Rothman, 1960, 108 U.S.App.D.C. 32, 278 F.2d 866; Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210; Office Employees, etc. v. National Labor Relations Board, 1957, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846; Hotel Employees, etc. v. Leedom, 1957, 101 U.S.App. D.C. 414, 415, 249 F.2d 506, 507 (dissenting opinion of Judge Fahy), reversed per curiam, 1958, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143. Cf. Remarks of Senator Taft, 93 Cong.Rec. 6859, 80th Cong., 1st Sess. (1947), 2 Legislative History 1623.

*2. Supervisor's statement:* An employee testified that he asked his supervisor, one Lightsey, if it were true, as rumored, that the plant would move if the Union won the election. "Mr. Lightsey told me he couldn't say whether the plant would move or not, but he would say two of our biggest customers, Sears Roebuck and Rexall wouldn't do business with a union company because of the fear of shortage of products due to strike. He did say if we lost these two big orders that possibly we would be cut down to three or four days in operation a week. If we didn't sell the products we couldn't make it."

The trial examiner found that "such a prediction of loss of work if employees vote for a union, based on unsupported anticipation of reaction by customers, is a threat in violation of the Act." The Board reversed. It held that "these statements are no more than predictions of possible future actions of third parties, should the Union win the election." Since "the statements contained no threats that the [Company] would take any steps to induce the happening of future events" the Board held they were privileged under § 8(c) of the Act.

That section provides that "the expressing of any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice * * * if such expression contains no threat of reprisal or force or promise of benefit." [9] This provision was enacted in 1947 to "make it clear that the Board is not to construe utterances containing neither threats nor promises of benefit as an unfair labor practice standing alone or as making some act which would otherwise be legal an unfair labor practice." Statement of Senator Taft, 93 Cong.Rec. 6859, 80th Cong., 1st Sess. (1947), 2 Legislative History 1624 (1948). In other words, Congress sought to overturn decisions in which the Board related an ambiguous act, such as firing a pro-union employee for unascertainable reasons, to a noncoercive general expression of anti-union sentiments, such as "unions are a menace to this country," in order to find an unfair labor practice. See colloquy between Senators Taft and Pepper, 93 Cong.Rec. 6446, 80th Cong., 1st Sess. (1947), 2 Legislative History 1545-46 (1948). But Congress nonetheless recognized that speech alone can be a coercive act, and that employer statements can, themselves, constitute an unfair labor practice if they contain threats of reprisal or promises of benefit. And such threats may be subtle or veiled. "[I]t is often difficult to distinguish a threat from a prediction." National Labor Relations Board v. McCatron, 9 Cir., 1954, 216 F.2d 212, 216. See Remarks of Senator Taft, 93 Cong.Rec. 6446, 80th Cong., 1st Sess. (1947), 2 Legislative History 1546 (1948).

9. 61 Stat. 140 (1947), 29 U.S.C.A. § 158(c).

It is well settled that an employer's "prediction" of untoward economic events may constitute an illegal threat if he has it within his power to make the prediction come true. National Labor Relations Board v. Nabors, 5 Cir., 1952, 196 F.2d 272, 276, certiorari denied 1953, 344 U.S. 865, 73 S.Ct. 106, 97 L.Ed. 671. Accord, National Labor Relations Board v. Mylan-Sparta Co., 6 Cir., 1948, 166 F.2d 485, 490; National Labor Relations Board v. Clearfield Cheese Co., 3 Cir., 1954, 213 F.2d 70. Although the employer in the instant case did not have such power, his representative categorically asserted that third parties, who had that power, had already determined to exercise it because they "wouldn't do business with a union company." No evidence was adduced at the hearing to support that assertion or to show any basis for the supervisor's belief in its truth. Nor does it appear that the basis was so widely known that the employee may fairly be presumed either to have known it or to have been able to discover it. In these circumstances, we think the statement in question is not protected by § 8(c). It seems clear that Congress did not intend to protect an unqualified assertion of such importance unless the utterer can show that he had some reasonable basis for it. See remarks of Senator Ellender, 93 Cong.Rec. 4137, 80th Cong., 1st Sess. (1947), 2 Legislative History 1066.

We recognize that a union election campaign is usually not conducted in a drawing room atmosphere. The Act does not proscribe vigorous and even colored expressions and predictions by heated participants on both sides. But neither does it confer a license to make an assertion of a specific and critical fact which is drawn from thin air.

It may be that the employer's failure to adduce evidence tending to show that the supervisor had a reasonable basis for the belief he asserted was due to the erroneous view that such showing was not required. Hence, in setting aside the Board's order on this issue, we remand with directions to afford an opportunity for the presentation of evidence upon which the Board may redetermine the issue in further proceedings.

So ordered.