330 F.2d 579
 WELLINGTON MILL DIVISION, WEST POINT MANUFACTURING COMPANY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
TEXTILE WORKERS UNION OF AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
West Point Manufacturing Company, Intervenor.
 No. 8974.
 No. 9019.
 United States Court of Appeals Fourth Circuit.
 Argued September 30, 1963.
 Decided March 25, 1964.
 COPYRIGHT MATERIAL OMITTED Frank A. Constangy, Atlanta, Ga. (Constangy & Prowell, Atlanta, Ga., on brief), for petitioner in No. 8974.
 
 Edward Wynne, New York City (Patricia Eames, New York City, on brief) for Petitioner in No. 9019.
 Janet Kohn, Atty. National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Allison W. Brown, Jr., Atty. National Labor Relations Board, on brief) for respondent.
 Before HAYNSWORTH, BOREMAN and J. SPENCER BELL, Circuit Judges.
 BOREMAN, Circuit Judge.
 
 
 1
 These consolidated cases are before the court upon petition of Wellington Mill Division, West Point Manufacturing Company, hereinafter referred to as the Company, to review and set aside an order[1] of the National Labor Relations Board following proceedings under section 10 of the National Labor Relations Act, as amended, 29 U.S.C.A. § 151 et seq., 61 Stat. 136, 73 Stat. 519, and upon the separate petition of Textile Workers Union of America, AFL-CIO, hereinafter referred to as the Union, to review a particular portion of the Board's decision. The Board has cross-petitioned for enforcement of its order against the Company and seeks denial of the Union's petition.[2] These cases were before a duly authorized panel of three Board members.
 
 
 2
 The Board found that the Company violated section 8(a) (1) of the Act, 28 U.S. C.A. § 158(a) (1), by discouraging union membership by discriminating in regard to the hire and tenure of employment of three of its employees who were active in the Union's organizational effort; by subjecting employees to repeated interrogation; by threats of harm and promise of benefit; by ordering employees not to discuss grievances and to inform other employees of their abandonment of union activity; and by suggesting and assisting in the formation of an antiunion employee group. The Board further found that the Company had violated section 8 (a) (3) of the Act, 29 U.S.C.A. § 158(a) (3), by discriminatorily discharging Milford Allen, Luther Jackson Evans and H. C. McKinney, Jr., the three active union adherents mentioned above.
 
 
 3
 The Company's plant here involved is a textile mill located at Anderson, South Carolina. The top executive in the plant is Andrew B. Calhoun, the Company's vice president. The plant manager, second in command, is J. R. Swetenburg. The work in the plant is divided into three eight-hour shifts, the first from 7:00 A.M. to 3:00 P.M., the second from 3:00 P.M. to 11:00 P.M., and the third from 11:00 P.M. to 7:00 A.M.
 
 
 4
 Late in July 1961, some of the Company's employees contacted representatives of the Union and began efforts to unionize employees in the plant. A committee was formed in August and numerous employees were solicited at their homes to sign applications for union membership. Some responded favorably and signed applications while others did not. Calhoun first became aware of these union activities early in September. On September 15 the Union wrote to the Company claiming to represent a majority of the production and maintenance employees in the plant and requested a meeting for the purpose of negotiating a contract. On or about September 20 the Company replied, declining to recognize the Union as bargaining representative of the employees until such time as it was certified by the Board. Meanwhile, on September 18 the Union had filed with the Board a petition seeking such certification.
 
 
 5
 Soon after learning of union activities, Calhoun began summoning small groups of employees into his office for discussion respecting the installation of new equipment, the Company's future plans and for the airing and consideration of any "gripes" the employees might have. At one of these meetings in Calhoun's office, about September 28, Calhoun informed the assembled employees that he did not think the Union could do them any good, that it could do them some harm and that the Company intended to oppose the Union to the last ditch. There was testimony to the effect that Calhoun said the intention was to oppose the Union by legal means. Be that as it may, the Board found the statement that the Union could do the employees some harm to be a warning constituting a veiled threat of reprisal violative of the Act. We are of the opinion that this finding and conclusion of the Board was in error. The statement by Calhoun was manifestly no more than a pronouncement of his opinion and contains no discernible threat of reprisal. We held in N. L. R. B. v. Threads, Incorporated, 308 F.2d 1 (4 Cir.1962), that a substantially similar statement by an employer to his assembled employees was unqualifiedly privileged under the provisions of section 8(c) of the Act, 29 U.S.C.A. § 158 (c).[3]
 
 
 6
 On September 20 the Company posted in its plant a notice which contained, among other things, the following language:
 
 
 7
 "Since the Union Has Started Up a Campaign in Our Plant, Some of You Have Been Asking Questions in Regard to the Following Matters. We have Decided to State the Company's Position on These Subjects as Clearly as We Can For Everybody alike:
 
 
 8
 "1. In the First Place, It Is Our Definite View That If the Union Were to Come in Here, It Would Work to Your Serious Harm."
 
 
 9
 We disagree with the Board's determination that the above quoted portion of the posted notice was coercive and violative of the Act. What we have said above respecting the statement by Calhoun applies with equal reason to such notice.
 
 
 10
 On or about September 14 Douglas Bryant, one of the Company's employees, began wearing in the plant a union badge symbolizing his adherence to the Union. On September 24 George Cromer, a supervisor in the plant, approached Bryant and said, "Doug, don't tell nobody I told you this, but for your own interest and the interest of your job, it is best that you turn in your badge." Bryant replied that he "would think about it." Later that same day Cromer again approached Bryant and said, "Doug, I wish you would turn in your badge." These statements by Cromer to Bryant were found by the Board to constitute a veiled threat of reprisal to induce Bryant not only to cease wearing the badge but to "turn it in"; in short, to thus notify the Company that he had abandoned his union activities. Whether Cromer meant to imply that Bryant turn in his badge to the Company or to the Union is not made clear from the testimony and we consider this point to be relatively immaterial. The fact is that, two days later, Bryant sought and was granted an interview with Calhoun and Swetenburg, at which time he physically tendered the badge to Calhoun stating that he would like to "turn in" his badge. Calhoun demurred saying, "I don't want that badge, you can throw it in the trash can." Bryant complied with Calhoun's suggestion by discarding the badge and Calhoun then stated, by way of terminating the interview, "We believe what you have got to say, I don't know what your fellow workers in the mill are going to think about it, unless you tell them." The latter statement was found by the Board to be a direction that Bryant tell the other employees what he had done and that it constituted an illegal interference. In view of the evidence in the record befor us, we are of the opinion that the statements made by Cromer were violative of the Act in that they were calculated to induce Bryant, by threat of danger of loss of his job and did successfully induce him, to relinquish a protected right, i. e., the wearing of a union badge. However, we find no substantial evidential support for the conclusion of the Board that by anything he said Calhoun directed Bryant to tell the other employees what he had done. Calhoun's statement was ambiguous and could well have been intended as an admonition to Bryant not to tell the others about it and thus spare himself the possible embarrassment of being considered what Bryant himself described as "a pimp to them [the company officials]."
 
 
 11
 As found by the Board from substantial evidence in the record, Ernest Ivester, a rank and file employee of the Company, during September helped to initiate and was one of the principal moving spirits behind a proposed organization of employees designated the "Citizens Club". The apparent intended purpose of the organization was to attempt to combat the organizational efforts of the Union by drawing together into discussion groups a number of employees "who were not interested in either party, either side, at the particular time." Ivester became the club's first and only chairman, addressed meetings of the club, explained why a Union would not help the employees and wrote a letter for publication in the local newspaper on the same subject. Ivester's efforts were aided to some degree by Sam Jordan, the personnel director of the plant. Jordan's assistance in this regard was limited to inquiring of some 15 to 25 employees whether they would be willing "to meet and discuss the problem. And ask any questions that they might have to ask." Jordan noted the names and addresses of those who indicated to him their willingness to attend and turned over the list to Ivester. Despite a finding by the Board that there was no evidence to connect either of the two principal officers, Calhoun and Swetenburg, with Jordan's assistance to Ivester, the Board concluded that by virtue of Jordan's conduct the Company was guilty of illegally interrogating the employees and of interfering with the employees in the exercise of their organizational rights. Here, as in N. L. R. B. v. Brookside Industries, Inc., 308 F.2d 224 (4 Cir. 1962), there were no threats of reprisals or coercion of any kind nor the aggressive fostering of antiunion activity decried by the courts in other cases.[4] Furthermore, there is no evidence in the record that Jordan was, in collecting the names, acting in the capacity as an instrument or agent of management. See N. L. R. B. v. Birmingham Publishing Company, 262 F.2d 2 (5 Cir. 1959). In fact, the Board's own finding of a lack of connection in this instance between Jordan and the executive officers tends to refute the claim that he was acting in such capacity.
 
 
 12
 Although not included in the complaint as a specific charge, the Board found the Company guilty of illegally restraining protected concerted activities of its employees when one of the supervisors, Carl Woods, in mid-August, told Milford Allen, one of the employees who was subsequently discharged, "Nick, I don't want you talking to nobody; you know what is going on down there." Later the same day, according to Allen's testimony, another supervisor, Snipes, asked Allen why he was dissatisfied. From these two incidents, and nothing more, the Board concluded: "Thus what Woods did was to prevent an employee known to be dissatisfied from discussing his `gripes' with his fellow employees." The Board's conclusion in this respect seems to us to lack substantial support in the evidence. The statement made by Woods is, in itself, ambiguous and no testimony was adduced on behalf of either side to explain its meaning. The Board argues in support of its conclusion that the Company neither cross-examined Allen about the incident nor called Woods to testify about it. Such an attitude ignores the well established principle that the burden is on the General Counsel to prove charges of unfair labor practices by sufficient evidence and is not upon the employer to disprove them. See National Labor Rel. Bd. v. Reynolds & Manley Lbr. Co., 212 F.2d 155 (5 Cir. 1954). Although the Board found, from Allen's testimony, that Supervisor Snipes subsequently asked Allen why he was dissatisfied, the finding in this regard wholly ignores the reasonable explanation by Snipes to the effect that he, knowing Allen to be one who knew what was going on in the weave room and knowing that a lot of the weavers were dissatisfied for some reason, had called Allen in to ask him what he knew about the apparent general dissatisfaction. This occurrence was prior to any disclosed company knowledge of union activity in the plant. Moreover, there was no evidence adduced to show that Supervisor Woods had any knowledge or suspicion of such dissatisfaction when he made the statement complained of or that Allen had been discussing "gripes" or was expected to begin doing so. In view of our disposition of this particular matter, it is unnecessary to pass upon the question as to whether the Board had the right to pass upon it when it was not included in the complaint.
 
 
 13
 The only other matters urged as error on the part of the Board concern its findings of discrimination in the discharges of McKinney and Allen and the layoff or separation of Evans.
 
 
 Discharge of Allen
 
 
 14
 Milford Allen, who initiated and actively participated in the Union's organizational efforts, had been an employee of the Company or its predecessor continuously since 1938 except for four years of military service between 1942 and 1946. He was a weaver regularly assigned to operate a set of twenty-nine looms on the second shift. During the few years immediately preceding his discharge, he had been called upon by the Company to perform a substantial amount of overtime work although the record evidence shows that Allen was a weaver of about average capacity.
 
 
 15
 On August 22, 1961, subsequent to Allen's commencement of union activity but prior to the time when the Company or any of the supervisors became aware of such activity, Allen's "second hand" (Williamson) made the following written report to Snipes, Allen's overseer:
 
 
 16
 "Subject: Poor quality work.
 
 
 17
 "Milford Allen has been talked to about poor quality work and being off job. I told him he would have to inspect properly and I did not expect it to happen again."
 
 
 18
 The Board found that at the time of the making of the written report Williamson personally reprimanded Allen for the alleged dereliction and warned him against repetition. Apparently this was the first reprimand Allen had received in his many years of employment by the Company but it is significant, as we later note, that this warning concerning poor performance was after Allen became enthusiastically concerned with unionizing activities.
 
 
 19
 On September 25 Williamson, having observed Allen's protracted absence from his looms on several occasions during the shift, told Allen that he had been off his job four or five times and called his attention to the fact that ten of his twenty-nine looms were out of operation. He directed Allen to go home and to return to see Overseer Snipes in the morning, the usual procedure when a second hand feels that an employee should be discharged. Allen reported to Snipes the following morning, at which time Snipes informed him of the written report of the incident, transmitted by Williamson to Snipes in the meanwhile, and told Allen that he would have to discharge him. At the time of the second alleged dereliction and the ensuing discharge, Allen's union adherence and activity were actually known to the Company. From conflicting evidence the Board, by uniformly crediting the testimony of Allen where it conflicted with that of both Williamson and Snipes, found that certain equivocal remarks, made both by Williamson at the time he told Allen to leave and by Snipes at the time he discharged Allen, indicated that the discharge was preconceived and was motivated by Allen's union adherence rather than by gross and wilful inattention to his job assignment. The Board concluded, from the Company's knowledge of Allen's union activity, the Company's demonstrated opposition and hostility to the Union and the remarks made by the supervisors, that the asserted dereliction of Allen was used by the Company as a mere "pretext" for discharging him and that the real reason for the discharge was Allen's union activity.
 
 
 20
 Although the circumstances surrounding Allen's misconduct and neglect are perhaps not as strong as those in some of our prior decisions in this area, in view of Allen's previous reprimand for the same sort of misconduct within a relatively short period prior to the second incident, this case should be controlled by our decision in N. L. R. B. v. Threads, Incorporated, 308 F.2d 1 (4 Cir. 1962). We there held, and not for the first time, that there is no legal basis for finding that the assigned reason for a discharge is a mere "pretext" where it is shown that the employee concerned was guilty of prior misconduct under circumstances which tend to negate any idea that the employer was searching for some false but plausible reason to be advanced in support of a discharge which was, in fact, discriminatory and based upon Allen's union activities. This principle gains added support in cases where, as here, the prior misconduct for which the employee had been specifically reprimanded and which he had been warned not to repeat was of the same nature as that assigned as the reason for the discharge. Furthermore, in N. L. R. B. v. United Brass Works, Inc., 287 F.2d 689, 693 (4 Cir. 1961), we held that "[i]f discrimination may be inferred from mere participation in union organization and activity followed by a discharge, that inference disappears when a reasonable explanation is presented to show that it was not a discharge for union membership." Also, as we there held, the fact that an employee is a union member and an active movant in an organizational campaign will not shield him from release for good cause. In view of some of the hereinafter mentioned circumstances shown by the record in the instant case, we might add that neither will repeated and pointed statements or actions by the employee, designed to bring his union adherence forcefully to the attention of his employer, shield the employee from discharge for good cause when such is reasonably shown to exist.
 
 
 21
 The looms to which Allen was assigned as a weaver stop automatically in the event of a mechanical failure or whenever the warp or filling breaks. It is the weaver's function, in case of such stoppage, to get the idle looms back into operation as quickly as possible and thus minimize loss of production. When the stoppage is caused by the breaking of the warp or filling, the weaver, if he is on the job, can quickly return the loom to production. If the stoppage is the result of mechanical failure, the weaver's responsibility is to put up a "flag" for a loom fixer whose duty it is to repair and return the loom to production as quickly as possible. Of course, if the weaver is not on his job none of the causes of loom stoppage can be remedied and the machines simply remain idle. When Williamson checked Allen's set of twenty-nine looms at the time he told Allen to leave, ten of Allen's looms were not in operation and there were no "flags" up to indicate mechanical trouble. According to the undisputed testimony of of second hand Williamson, all except one of these ten could have been quickly put in operation by Allen. The other loom was stopped because of a mechanical failure and, although Allen could not have restored it to operation himself, his responsibility was to put up a "flag" indicating the need for a loom fixer. Had Allen been on the job and performing his function, the machine might very well have been under repair or even back in operation at the time.
 
 
 22
 The Board in effect found that the Company's explanation tending to show that Allen's discharge was for cause and not for union membership and activity was not reasonable.
 
 
 23
 Viewed "in the light that the record in its entirety furnishes," we "cannot conscientiously find that the evidence supporting [the Board's] decision is substantial." Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). The Board emphasizes that Allen had been a satisfactory employee over the previous term of his employment and had not until August 22, 1961, received any formal reprimands or been the subject of any adverse performance reports. However, these circumstances do not, in this particular case, lend compelling support to the finding that the Company was motivated purely by union antipathy. In view of the fact that both incidents occurred subsequent to Allen's recently undertaken union activities, the first of which occurred prior to the time that the Company became aware of such activities, the picture portrayed is that of an employee, previously exhibiting at least average loyalty to his job and satisfactory performance, who becomes so engrossed in union and antimanagement activities that he neglects his job responsibilities. It is clear that an employer has the right to discharge any employee under such circumstances, whether he be active in union organization or not.
 
 
 24
 Also urged by the Board in support of the finding of discrimination in the discharge of both Allen and McKinney is the testimony concerning an incident on September 25 when Allen, McKinney and another employee, Walker, went to see Overseer Snipes, told him that they had heard rumors that they were going to be fired because of their union activity and informed Snipes that "if they were fired, they would take it to the National Labor Relations Board." On that occasion the three employees were obviously intent upon making sure that the overseer knew that they were active union adherents and members. At the time, Snipes attempted to assure the three that they would not be fired for union activity (Walker was not discharged) and, in response to their inquiry, told them that their performances as employees had been satisfactory thus far. We consider it nothing short of remarkable that the Board should find that by Snipes' remarks he bound the Company and all other supervisors to the proposition that Allen's work had been perfectly acceptable until that time. Furthermore, it is our considered opinion that the incident and the manner in which it occurred only serve to demonstrate the antagonistic attitudes of the three employees. Their obvious purpose in seeking out Snipes and openly threatening complaint to the Labor Board was to immunize themselves against discharge for cause by setting the stage for a claim of discrimination if they were discharged. These observations respecting the September 25th incident apply with equal force to the discharge of McKinney, hereinafter discussed.
 
 
 Layoff of Evans
 
 
 25
 Luther Evans was last employed by the Company on August 29, 1961, and assigned to operating a "folder" in the cloth room on the second shift. He had been earlier employed for a period of a few months. A few days after his last employment, he applied for union membership and on or about September 21 began to wear a union badge to work, which fact was reported to Calhoun. Although the testimony in the record is in direct conflict on the point, the Board, by crediting Evans' testimony in its entirety and discrediting the pertinent part of the supervisor's testimony entirely, found that Supervisor Massey, by offer to Evans of promotion to a supervisory capacity, unsuccessfully attempted to persuade him to relinquish his union badge. Any authority of Massey to offer any such inducement is not made to appear and it is incredible that the newest employee in the plant would be considered for selection as a supervisor over the many employees with more experience and seniority. The Board further found that upon Evans' refusal to comply with Massey's purported request, Evans was laid off the following morning, September 26. The Company's assigned reason for the layoff of Evans was that the work of an employee, Dutton, with more seniority in the spinning room, had been completed and rather than lay off Dutton it was decided, in accordance with the Company's established seniority policy, to lay off Evans, the most recently hired employee in the plant, and transfer Dutton to fill Evans' job. Again, the Board in effect found that the explanation given by the Company for separating Evans was not reasonable and, in view of the fact that Evans' layoff followed soon after he openly evidenced his union adherence, the reason given by the Company was a mere "pretext" for ridding itself of a union member.
 
 
 26
 There is unrefuted evidence in the record that the impending probability of a reduction in available jobs and resultant layoff of some employees had been previously announced by plant officials at overseers' meetings. The evidence further discloses that Dutton's job had been completed and that Dutton was, in fact, transferred to the job vacated by Evans. Furthermore, the record shows without any substantial conflict that Evans was a new employee still subject to a 90-day probationary period; that such probationary employees are, in accordance with the special layoff provisions of the Company's Employee Relations Manual, the first ones to be laid off in the event of curtailment; that the Company's policy respecting layoffs is interdepartmental in nature; and that Evans, in addition to being a probationary employee, was the last one hired in the entire plant. Evans, himself, admitted that at the time he was employed he was informed that he would be on probationary status for 90 days. At the time of his layoff he demanded and received his wages then due although he would normally be paid as an employee on the next regular pay day. This fact and the fact that he quickly sought and obtained other employment strongly indicate that he had no expectation of recall.
 
 
 27
 The Board points to the fact that while Evans was still being carried by the Company as laid off, two other new employees were hired without a notice of recall to Evans. This fact, standing alone, has no direct relation to the real reason for Evans' layoff in the first instance. The Company explains its failure to recall Evans by showing that, at the time the new employees were hired, Evans had obtained and was engaged in other employment which the Company's personnel manager felt was a better job than the ones for which the new employees were hired. There is no proof here of any established custom or practice of recalling laid-off probationary employees with no recognized seniority rights. If such probationary employee is laid off because his services are no longer needed, surely it cannot be successfully contended that he has a vested right to re-employment.
 
 
 28
 From a consideration of the entire record, the explanation for the layoff of Evans stands up under scrutiny and cannot be said to be unreasonable. See N. L. R. B. v. Moore Dry Kiln Company, 320 F.2d 30 (5 Cir. 1963).
 
 
 Discharge of McKinney
 
 
 29
 H. C. McKinney, Jr., had been in the employ of the Company for about fourteen years and had apparently performed satisfactorily during his tenure. When union organizational activity began at the plant, McKinney, together with Allen, was a moving spirit in promoting the campaign.
 
 
 30
 On September 20, 1961, the Company posted on the plant's bulletin boards a plant rule which reads as follows:
 
 
 31
 "No person will be allowed to carry on union organizing activities in the plant during working hours. Anybody who does so and thereby interferes with his own work or the work of others will be discharged." (Emphasis ours.)[5]
 
 
 32
 Sometime during September the Company ordered a number of copies of a reprint of a collection of magazine articles entitled "The Henderson Story." The articles, generally speaking, espoused the employer's point of view rather than that of the Union. Copies of "The Henderson Story" were made available to the Company's employees by the overseers and second hands. McKinney read the articles and found in them a paragraph which impressed him as supporting his view as to the value of a union. In direct violation of the plant rule quoted above and with knowledge of the rule and its announced penalty for violation thereof, McKinney circulated among the employees during working hours and, in some cases interfering with the work of others, insisted that they take time out to read the paragraph. In some instances McKinney's activities in this regard evoked antagonism and started argument. These activities came to the attention of his supervisor who sent McKinney home with orders to report to Overseer Snipes the following day. The supervisor transmitted a written report to Snipes. When McKinney reported the next day Snipes discharged him for the assigned reason that he had violated the posted rule.
 
 
 33
 The Board found that the reason assigned by the Company for McKinney's discharge was likewise a mere "pretext" and that the real reason was McKinney's leadership and activity in the Union. The Board's finding in this regard was explained as follows: McKinney's vigorous and early support of the Union; the wearing of a union badge, openly, in the plant; management's knowledge of his union activities; the Company allowed other employees to read "The Henderson Story" during working hours but discharged McKinney for violating the so-called "no-solicitation rule"; the supervisor, Williamson, who ordered him off the job, told McKinney that the discharge was not his (Williamson's) doing but that "the orders came from higher up" although there was no evidence that those who were "higher up" had been apprised at that time of McKinney's violation of the rule; thereafter Williamson told another employee that he had his orders and that it was McKinney's job or his. From the latter two circumstances the Board concludes that the order to terminate McKinney was issued before the alleged violation of the posted rule. McKinney candidly admitted at the hearing that he showed the paragraph from "The Henderson Story" to about ten employees before he was sent home.
 
 
 34
 Board panel member Rodgers dissented from the conclusion of the two other members of the panel with respect to McKinney, saying, "I would find that McKinney was lawfully discharged for flagrantly violating a valid no-solicitation rule." We agree with the dissenting member of the panel. Furthermore, we find no substantial support in the record for the conclusion of the majority of the panel respecting McKinney's discharge and accordingly hold it to constitute error.
 
 
 35
 The Board declined to follow the holding of the Supreme Court in a somewhat similar case, stating that it is inapplicable. But we are of the opinion that, generally, an employer may not be held to have been acting discriminatorily in distributing antiunion literature and otherwise engaging an antiunion solicitation while at the same time enforcing a rule prohibiting activities on the part of its prounion employees which disrupt regular work schedules and interfere with production. See N. L. R. B. v. United Steelworkers, 357 U.S. 357, 78 S. Ct. 1268, 2 L.Ed.2d 1383 (1958). Implicit in the Supreme Court's holding in this regard is the proposition that an employer may, without being charged with discrimination, discharge employees who violate a valid no-solicitation rule while concurrently sanctioning the distribution of antiunion material. Were it otherwise, the employer would be powerless to enforce the rule.
 
 
 36
 We quote with approval and adopt that portion of the dissent of Board Member Rodgers as follows:
 
 
 37
 "It is also clear that McKinney knowingly and flagrantly violated a validly promulgated rule, that discharge was the announced penalty for the violation of the rule, and that he was discharged when Respondent learned that the rule had been breached. Unlike my colleagues, I cannot infer from the facts in this record that McKinney was exempt from the plant rule merely because he was one of the Union's earliest and strongest supporters or because he wore a union button in the plant. Nor will I speculate that Respondent had issued an order to terminate McKinney before the above-described solicitation. There is absolutely no record evidence supporting such speculation."
 
 
 Validity of No-Solicitation Rule Not in Issue
 
 
 38
 As previously noted,[6] the Union urges this court to pass upon the validity of the Company's posted no-solicitation rule. At the close of the hearing, General Counsel expressly disavowed any contention that the rule was in itself unlawful. Consequently, the Examiner found and the Board accepted the finding that the validity of the rule was not in issue.[7] Nevertheless, the Union asks us to find the rule unlawful.
 
 
 39
 Section 3(d) of the Act commits to the discretion of the General Counsel the decision as to whether he will issue a complaint[8] and his refusal to do so is final and unappealable.[9] The decision as to the scope of a complaint is for the General Counsel.[10]
 
 
 40
 The Board cannot entertain an amendment to the complaint which the General Counsel opposes. International Union of Elec., Radio and Machine Workers A.F.L.-C.I.O. v. N. L. R. B., 110 U. S.App.D.C. 91, 289 F.2d 757, 762 (1960). In that case the court agreed with the Board that the latter was without power to take action sought by the union when, at the hearing, as charging party, it formally moved to amend the complaint to include certain charges which had been dismissed by General Counsel. It follows that the Union could not put in issue before the Board, by its exceptions filed to the Examiner's report, a matter as to which the General Counsel had declined to allege illegality. In fact, by a prehearing amendment, General Counsel amended paragraph 14 of the complaint to allege, in subparagraph (c), that the Company "discriminatorily enforced plant rules posted on September 20, 1961, prohibiting union activities in the plant during working hours. * * *." By alleging discriminatory enforcement, General Counsel necessarily assumed a valid rule. The Board found that McKinney was discharged, not for violation of the rule itself but because of his union membership and adherence.
 
 
 41
 The Union asks this court's judgment on the merits of a matter never properly put in issue and not passed upon by the Board.[11] Its request must be denied. A court has no power to order the General Counsel to issue a complaint and no power to require the Board to issue an order in a matter which is not before it. Hourihan v. N. L. R. B., 91 U.S. App.D.C. 316, 201 F.2d 187 (C.A.D.C. 1952), cert. denied, 345 U.S. 930, 73 S.Ct. 792, 97 L.Ed. 1359 (1953).
 
 
 42
 The Board's order will be enforced insofar as it requires the Company to cease and desist from attempting to persuade its employees, by threats of reprisal or promises of benefit, to cease wearing or turn in union badges or emblems or, in any other manner, interfering with, restraining or coercing its employees in the exercise of rights guaranteed them in section 7 of the Act. In all other respects enforcement will be denied.
 
 
 43
 Enforcement granted in part and denied in part.
 
 
 
 Notes:
 
 
 [1]
 The Board's decision and order are reported at 141 NLRB No. 73
 The Board ordered the Company to cease and desist from:
 (a) Discouraging membership in Textile Workers Union of America, AFL-CIO, or any other labor organization, by discriminating against its employees in regard to their hire or tenure of employment or any term or condition of employment.
 (b) Interrogating its employees with regard to their union membership, sympathy, or activities, in a manner violative of Section 8(a) (1) of the Act.
 (c) Attempting to persuade its employees, by threats of reprisal or promises of benefit, to cease wearing or to to turn in union badges or emblems.
 (d) Requesting any of its employees to tell other employees that he has stopped wearing or has turned in his union badge.
 (e) Suggesting that its employees organize to combat any labor organization, or assisting employees to start such a movement.
 (f) Threatening its employees with reprisal because of their membership in, sympathy, or activity on behalf of any labor organization.
 (g) Prohibiting its employees from discussing grievances with other employees.
 (h) In any other manner interfering with, restraining or coercing its employees in the exercise of rights guaranteed them in Section 7 of the Act.
 The Board further ordered the Company to offer to Milford Allen, Luther Jackson Evans and H. C. McKinney, Jr., full reinstatement to their former or substantially equivalent positions with back pay, together with 6% per annum interest on the back pay, the interest to be computed in the manner set forth in Isis Plumbing & Heating Co., 138 NLRB No. 97.
 
 
 [2]
 The only question raised by the Union's petition and dealt with in its brief is whether the Company rule, which prohibits union organizational activities in the plant during working hours and provides that any employee who violates the prohibition and thereby interferes with his own work or the work of others will be discharged, is valid. The Union urges this court to declare the rule discriminatory upon the language of the rule alone as well as in the context of the surrounding circumstances of this case. The general counsel specifically declined to include in his complaint before the Board any such charge of discrimination, and the Board for that reason specifically declined to consider the question but assumedarguendo that the rule was valid and nondiscriminatory.
 
 
 [3]
 "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C.A. § 158(c)
 
 
 [4]
 Actually, as was also found by the Board, the initial suggestion respecting the desirability of forming the "Citizens Club" came from Reverend R. C. Emory, a local minister who was not shown to have any connection with the plant. Reverend Emory, rather than the Company, fostered the idea of such an organization by approaching, separately, both Ivester and Jordan (and, for all the record shows, a number of others) and suggesting to them its formation. In fact, as the record reveals, Reverend Emory approached Ivester on the subject on two separate occasions urging action on the part of Ivester in organizing the group
 
 
 [5]
 It is of particular pertinence that the stated penalty of discharge was to be invoked in case the prohibited activity interfered with the offender's own work or the work of others
 
 
 [6]
 See footnote 2, supra
 
 
 [7]
 If the validity of the rule were in issue here, we would call attention to Stoddard-Quirk Mfg. Co., 138 N.L.R.B. No. 75, wherein the Board itself said:
 "Almost from the outset the Board has held with court approval that an employer may in the normal situation make and enforce a rule forbidding his employees to engage in such union solicitation during working time (`working time is for work'), * * *." (Emphasis supplied.)
 Also N. L. R. B. v. Avondale Mills, 242 F.2d 669, 671 (5 Cir. 1957), where the court said:
 "There is and can be no dispute that the company had a right to prohibit union solicitation in its plant during working hours." (Cited cases omitted.)
 
 
 [8]
 See International Union of Electrical, Radio and Machine Workers, AFL-CIO, v. N. L. R. B., 110 U.S.App.D.C. 91, 289 F.2d 757, 760 (C.A.D.C.1960)
 
 
 [9]
 Retail Store Employees Union Local 954, Retail Clerks Intern. Ass'n., A.F.L.-C.I.O. v. Rothman, 112 U.S.App.D.C. 2, 298 F.2d 330, and cases cited at p. 332 (1962)
 
 
 [10]
 See Piasecki Aircraft Corporation v. N. L. R. B., 280 F.2d 575, 586-88 (3 Cir. 1960)
 
 
 [11]
 In support of its position, the Union cites National Labor Relations Board v. Mackay Co., 304 U.S. 333, 351, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); N. L. R. B. v. International Brotherhood of Teamsters, etc., 225 F.2d 343 (8 Cir. 1955); N. L. R. B. v. Puerto Rico Rayon Mills, Inc., 293 F.2d 941 (1 Cir. 1961); and N. L. R. B. v. H. E. Fletcher Co., 298 F. 2d 594, 600 (1 Cir. 1962). As support for the Union's contention here presented, we find these cases unpersuasive
 
 
 
 44
 J. SPENCER BELL, Circuit Judge (dissenting in part):
 
 
 45
 I concur in the majority's denial of the Union's request that this court declare the Company's no-solicitation rule invalid. I also concur in the enforcement of that portion of the Board's order requiring the Company to cease and desist from "attempting to persuade its employees, by threats of reprisal or promise of benefit, to cease wearing or turn in Union badges or emblems" or, "in any other manner, interfering with, restraining or coercing its employees in the exercise of rights guaranteed them in Section 7 of the National Labor Relations Act."
 
 
 46
 I feel compelled to dissent from the remainder of the majority opinion, however, since I am persuaded that the trial examiner's Recommended Order, as affirmed by the Board,[1] is amply supported by substantial evidence in the record viewed as a whole. The Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), held that a Court of Appeals is "not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Nonetheless, a Court of Appeals is admonished that it "may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Ibid. I think that the majority failed to heed this admonition in the instant case.
 
 
 47
 In this respect the case is a departure from a series of cases decided by this court subsequent to Universal Camera; cases in which we enforced Board orders where the position taken by the Board had substantial support in the whole record, despite evidence to the contrary and despite our own notions as to how the case should have been decided in the first instance. See, e. g., N. L. R. B. v. Lester Bros., Inc., 301 F.2d 62 (4 Cir. 1962); N. L. R. B. v. Pugh & Barr, Inc., 231 F.2d 558 (4 Cir. 1956); N. L. R. B. v. School Timer Frocks, Inc., 224 F.2d 336 (4 Cir. 1955). Sound policy considerations buttress our disposition of these cases, quite apart from the deference due the trial examiner and Board in their special area of competence. At an unfair labor practice proceeding, the trial examiner hears the testimony, notices the demeanor of each witness, and is, therefore, the one person able to make determinations of credibility from insights gained through personal observations.
 
 
 48
 In the instant case the trial examiner was required to determine the Company's real motive behind three discharges and also to determine whether certain activities of Company officials and supervisory personnel involved a threat of reprisal or force or promise of benefit and thereby exceeded the permissible bounds of freedom of expression.[2] These ultimate determinations required the trial examiner to first decide between conflicting versions of what occurred, and even when there was little dispute as to basic facts, to decide the most logical inferences to be drawn therefrom. The trial examiner did not resolve all questions of credibility against Company witnesses; nor did he draw all inferences adverse to the Company; indeed he found that the Company had committed only a little more than half of the unfair labor practices with which it had been charged. My reading of the record convinces me that it furnishes substantial support for those unfair labor practices which were actually found. In setting aside those findings of the trial examiner, and the Board's affirmance,[3] I think the majority has attempted to retry this case de novo in contravention of the principles of review laid down in Universal Camera.
 
 
 49
 While I deem an extended discussion of all the alleged unfair labor practices unwarranted, I should like to pinpoint my disagreement with the majority as to one. The record reveals that after the Company became aware of the Union's organizational drive, Sam Jordan, the Company's personnel director, asked Ernest E. Ivester, a rank and file employee, if he would be willing to help organize a group "for those not interested in either * * * side." The majority readily admits that the purpose of this organization was "to attempt to combat the organizational efforts of the Union." In furtherance of this plan, Jordan interviewed during working time some 15-25 mill employees and inquired if they would be willing to meet together and discuss "the problem." The trial examiner credited Ivester's testimony that Jordan later turned the list over to him, explaining that "if I [Ivester] wanted to take it from there, and mail out some invitations, or get in touch with them in any way I saw fit, then he had this many names and addresses that I could get started on." Ivester thereupon sent out invitations, and the "Citizens Club" came into existence with Ivester its Chairman. On these facts the trial examiner inferred that Jordan had been the moving spirit in the formation of the organization, and considered it "doubtful that any such movement could or would have been successfully launched without Jordan's help." The trial examiner found no further assistance to or participation in the Citizens Club by any Company official or supervisor.
 
 
 50
 Based on the foregoing, the trial examiner, affirmed by the Board, found that the Company had interfered with, restrained, and coerced its employees by "Jordan's suggestion to Ivester in September that Ivester help organize an antiunion movement and his furnishing Ivester with a list of employees expected to support such a movement." The Company was, therefore, ordered "to cease and desist from suggesting that its employees organize to combat any labor organization or assisting employees to start such a movement."
 
 
 51
 The majority absolves the Company of responsibility for Jordan's conduct by pointing out that there was no evidence that Jordan was acting as an instrument or agent of management. In order to hold the Company responsible for an unfair labor practice the majority apparently would have required either prior authorization or knowledge or subsequent ratification of Jordan's scheme by Andrew B. Calhoun and J. R. Swetenburg, the two principal resident officers of the Company. I think such requirements contrary to both the specific language of the National Labor Relations Act and to the decided cases.
 
 
 52
 Section 2(2) of the Act[4] provides that "The term `employer' includes any person acting as an agent of an employer, directly or indirectly * * *." Section 2(13)[5] further provides that "In determining whether any person is acting as an `agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." (Emphasis added.) Section 2(2), according to the House Committee, was intended to make "employers responsible for what people say and do only when it is within the actual or apparent scope of their authority" and thus "to make the ordinary rules of the law of agency equally applicable to employers and to unions." H.R.Rep.No.245, 80th Cong. 1st Sess., p. 11. Section 13 according to the later Conference Report, meant that "both employers and labor organizations will be responsible for the acts of their agents in accordance with the ordinary common law rules of agency (and only ordinary evidence will be required to establish the agent's authority)." H.R. Conf.Rep.No.510, 80th Cong. 1st Sess., p. 36, U. S. Code Cong. Service 1947, p. 1142.
 
 
 53
 These sections changed the import of old Section 2(2) of the Wagner Act which had defined employer to include "any person acting in the interest of an employer, directly or indirectly." It seems clear that the amendment of Section 2(2) and the addition of Section 2(13) were aimed at exonerating management of responsibility for acts undertaken by those beyond its control and direction. But management must be held responsible for the acts of those over whom it has the right of control and direction, and it is immaterial whether such acts are committed with the knowledge and acquiescence of superiors, N. L. R. B. v. Texas Independent Oil Co., 232 F.2d 447 (9 Cir. 1956), or without their knowledge, under the cloak of apparent authority, N. L. R. B. v. Houston Chronicle Publishing Co., 300 F.2d 273 (5 Cir. 1962); Local 636 of United Ass'n. of Journeymen and Apprentices of Plumbing and Pipe Fitting Industries of United States v. N. L. R. B., 109 U.S.App.D.C. 315, 287 F.2d 354 (D. C. Cir. 1961); Time-O-Matic, Inc. v. N. L. R. B., 264 F.2d 96 (7 Cir. 1959); American Rubber Products Corp. v. N. L. R. B., 214 F.2d 47 (7 Cir. 1954).
 
 
 54
 At a minimum, Jordan, acting in a supervisory capacity, as personnel director of the Company, had apparent authority to act in behalf of management in the formation of the Citizens Club. Certainly to rank and file employees at the plant, it must have appeared that Jordan was acting to carry out management policies. N. L. R. B. v. Texas Independent Oil Co., supra, N. L. R. B. v. Geigy Co., 211 F.2d 553, (9 Cir.), cert. denied, 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954). In these circumstances, I think the trial examiner and Board were compelled to find that the Company was responsible for the actions of Jordan. Any other finding would have been contrary to the letter and spirit of the National Labor Relations Act. The action of the majority goes far in insulating the top echelons of management from responsibilities which are, in all fairness, undeniably theirs.
 
 
 
 Notes:
 
 
 [1]
 The Board declined to adopt the finding of the trial examiner that the Company had violated the Act by disparate application and enforcement of its no-solicitation rule. In all other respects the Board adopted as its order the trial examiner's Recommended Order
 
 
 [2]
 "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C.A. § 158(c)
 
 
 [3]
 See n. 1, supra
 
 
 [4]
 49 Stat. 450 (1935), 61 Stat. 137 (1947), 29 U.S.C.A. § 152(2)
 
 
 [5]
 49 Stat. 450 (1935), 61 Stat. 137 (1947), 29 U.S.C.A. § 152(13)