**Yvonne C. EDWARDS, Appellant,**

v.

**Nathan HABIB, Appellee.**

**No. 20883.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 22, 1968.

Decided May 17, 1968.

Petition for Rehearing En Banc
Denied July 11, 1968.

---

Danaher, Circuit Judge, dissented.

Mr. Brian Michael Olmstead, Des Moines, Iowa, with whom Mrs. Florence Wagman Roisman, Washington, D. C., was on the brief, for appellant.

Mr. Herman Miller, Washington, D. C., for appellee.

Messrs. Charles T. Duncan, Corporation Counsel for the District of Columbia, Hubert B. Pair, Principal Asst. Corporation Counsel, and Richard W. Barton and David P. Sutton, Asst. Corporation Counsel, filed a brief on behalf of the District of Columbia as amicus curiae, urging reversal.

Mr. Reuben B. Robertson, III, Washington, D. C., filed a brief on behalf of the National Capital Area Civil Liberties Defense and Education Fund as amicus curiae, urging reversal.

Before DANAHER, WRIGHT and McGOWAN, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

In March 1965 the appellant, Mrs. Yvonne Edwards, rented housing property from the appellee, Nathan Habib, on a month-to-month basis. Shortly thereafter she complained to the Department of Licenses and Inspections of sanitary code violations which her landlord had failed to remedy. In the course of the ensuing inspection, more than 40 such violations were discovered which the Department ordered the landlord to cor-

rect. Habib then gave Mrs. Edwards a 30-day statutory notice [1] to vacate and obtained a default judgment for possession of the premises.[2] Mrs. Edwards promptly moved to reopen this judgment, alleging excusable neglect for the default and also alleging as a defense that the notice to quit was given in retaliation for her complaints to the housing authorities. Judge Greene, sitting on motions in the Court of General Sessions, set aside the default judgment and, in a very thoughtful opinion, concluded that a retaliatory motive, if proved, would constitute a defense to the action for possession.[3] At the trial itself, however, a different judge apparently deemed evidence of retaliatory motive irrelevant and directed a verdict for the landlord.

Mrs. Edwards then appealed to this court for a stay pending her appeal to the District of Columbia Court of Appeals, and on December 3, 1965, we granted the stay, provided only that Mrs. Edwards continue to pay her rent. Edwards v. Habib, 125 U.S.App.D.C. 49, 366 F.2d 628 (1965). She then appealed to the DCCA, which affirmed the judgment of the trial court. 227 A.2d 388 (1967). In reaching its decision the DCCA relied on a series of its earlier decisions holding that a private landlord was not required, under the District of Columbia Code, to give a reason for evicting a month-to-month tenant and was free to do so for any reason or for no reason at all.[4] The court acknowledged that the landlord's right to terminate a tenancy is not absolute, but felt that any limitation on his prerogative had to be based on specific statutes or very special circumstances.[5] Here, the

1. 45 D.C.CODE § 902 (1967), Notices to quit—Month to month:
   "A tenancy from month to month, or from quarter to quarter, may be terminated by a thirty days' notice in writing from the landlord to the tenant to quit, or by such a notice from the tenant to the landlord of his intention to quit, said notice to expire, in either case, on the day of the month from which such tenancy commenced to run."

2. 45 D.C.CODE § 910 (1967), Ejectment or summary proceedings:
   "Whenever a lease for any definite term shall expire, or any tenancy shall be terminated by notice as aforesaid, and the tenant shall fail or refuse to surrender possession of the leased premises, the landlord may bring an action of ejectment to recover possession in the United States District Court for the District of Columbia; or the landlord may bring an action to recover possession before the District of Columbia Court of General Sessions, as provided in sections 11–701 to 11–749."
   See also 16 D.C.CODE § 1501 (1967).

3. Rule 55(e)(2) of the Court of General Sessions provides that a motion to vacate a judgment of default shall be accompanied by a verified answer "setting up a defense sufficient if proved to bar the claim in whole or in part." Though the rule does not apply in landlord and tenant actions, Judge Greene felt that it constituted "a reliable guide to the exercise of the Court's determination on a default." Consequently he did not simply reopen the judgment upon a showing of excusable neglect, but went on to consider whether the defendant had set up a "defense sufficient, if proved, to bar the claim."

4. Fowel v. Continental Life Ins. Co., D.C. Mun.App., 55 A.2d 205 (1947); Warthen v. Lamas, D.C.Mun.App., 43 A.2d 759 (1945). In Fowel the court held that evidence as to the landlord's reasons for seeking possession was inadmissible.

5. The DCCA acknowledged three distinct lines of cases "wherein a landlord's right to terminate a tenancy has been limited." 227 A.2d at 390. First, where a governmental body is the landlord, it is subject to the requirements of due process and cannot act arbitrarily towards its tenants. Rudder v. United States, 96 U.S.App.D.C. 329, 331, 226 F.2d 51, 53 (1955); Housing Authority of City of Los Angeles v. Cordova, 130 Cal.App.2d Supp. 883, 885, 279 P.2d 215, 216 (1955), cert. denied, 350 U.S. 969, 76 S.Ct. 440, 100 L.Ed. 841 (1956). See also Thorpe v. Housing Authority, 386 U.S. 670, 87 S.Ct. 1244, 18 L.Ed.2d 394 (1967). Second, where there is emergency rent control legislation restricting the contractual rights of landlords. Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921). And third, where eviction was in retaliation for the tenant's registering to vote or

court concluded, the tenant's right to report violations of law and to petition for redress of grievances was not protected by specific legislation and that any change in the relative rights of tenants and landlords should be undertaken by the legislature, not the courts. We granted appellant leave to appeal that decision to this court. We hold that the promulgation of the housing code by the District of Columbia Commissioners at the direction of Congress impliedly effected just such a change in the relative rights of landlords and tenants and that proof of a retaliatory motive does constitute a defense to an action of eviction. Accordingly, we reverse the decision of the DCCA with directions that it remand to the Court of General Sessions for a new trial where Mrs. Edwards will be permitted to try to prove to a jury that her landlord who seeks to evict her harbors a retaliatory intent.

I

■■ Appellant has launched a constitutional challenge to the judicial implementation of 45 D.C. CODE §§ 902 and 910 in aid of a landlord who is evict-

ing because his tenant has reported housing code violations on the premises. We do not, however, reach the question whether it is unconstitutional for the court to apply the statute in such circumstances because we think Congress never intended that it be so applied. Nevertheless, because constitutional considerations inform the statutory construction on which our decision rests, we do discuss them briefly.[6]

Appellant argues first that to evict her because she has reported violations of the law to the housing authorities would abridge her First Amendment rights to report violations of law and to petition the government for redress of grievances. But while it is clear beyond peradventure that the making of such complaints is at the core of protected First Amendment speech,[7] and that punishment, in the form of eviction, if imposed by the state would unconstitutionally abridge First Amendment rights, it is equally clear that these rights are rights against government, not private parties. Consequently, before appellant can prevail on this theory she must show

actually voting. United States v. Bruce, 5 Cir., 353 F.2d 474 (1965); United States v. Beaty, 6 Cir., 288 F.2d 653 (1961). The DCCA distinguished the voting cases as involving "specific * * * legislation" enacted to protect the right intimidated by eviction. The court also acknowledged, without evaluative comment, that some courts have allowed a tenant to show as a defense that his eviction was sought solely because of his race. Abstract Investment Co. v. Hutchinson, 204 Cal.App.2d 242, 22 Cal.Rptr. 309 (1962). Racially restrictive covenants are unenforceable in the District in part because their enforcement might be contrary to "the public policy of the United States." Hurd v. Hodge, 334 U.S. 24, 34, 68 S.Ct. 847, 853, 92 L.Ed. 1187 (1948).

6. The lurking constitutional issues are relevant to our construction of the statutes in two ways. First, where two interpretations are plausible, we should opt for the one that avoids the constitutional questions. District of Columbia v. Davis, 125 U.S.App.D.C. 311, 371 F.2d 964, cert. denied, 386 U.S. 1034, 87 S.Ct. 1487, 18 L.Ed.2d 598 (1967). And sec-

ond, in discerning the intent of Congress we must assume that it too sought to avoid constitutional doubt and to protect the constitutional interests which are at stake. See Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); Yates v. United States, 354 U.S. 298, 319, 77 S.Ct. 1064, 1077, 1 L.Ed.2d 1356 (1957): "We need not, however, decide the issue before us in terms of constitutional compulsion, for our first duty is to construe this statute. In doing so we should not assume that Congress chose to disregard a constitutional danger zone * * *."

7. The First Amendment gives express recognition to the right of the people "to petition the Government for a redress of grievances." U.S.Const., Amend. I. See A. MEIKLEJOHN, POLITICAL FREEDOM (1960), a republication in expanded form of his work FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT (1948); Meiklejohn, The First Amendment is an Absolute, 1961 SUP.CT.REV. 245; Kalven, The New York Times Case: A Note on "The Central Meaning of the First Amendment", 1964 SUP.CT.REV. 191.

that the government is in some relevant sense responsible for inhibiting her right to petition for redress of grievances; she must show, in other words, the requisite "state action." [8] Appellant seeks to overcome this obstacle by arguing that the use of courts to effect her eviction sufficiently implicates the state as to bring into play constitutional constraints. She relies on an unreported decision of the United States District Court for the Southern District of New York, where the court invoked just such a theory to support the issuance of a preliminary injunction restraining an alleged retaliatory rent increase. Tarver v. G. & C. Construction Corp., S.D.N.Y., November 9, 1964.

There can now be no doubt that the application by the judiciary of the state's common law, even in a lawsuit between private parties, may constitute state action which must conform to the constitutional strictures which constrain the government. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This may be so even where the court is simply enforcing a privately negotiated contract. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct.

836, 92 L.Ed. 1161 (1948). But the nature and extent of the judicial involvement required to bring into play these constitutional constraints is unclear. The central case is, of course, Shelley v. Kraemer, where the Court ruled that judicial enforcement of private agreements containing restrictive covenants against selling to Negroes violated the Fourteenth Amendment's command that "[n]o State shall * * * deny to any person within its jurisdiction the equal protection of the laws." But the contours of *Shelley* remain undefined and it is uncertain just how far its reasoning extends.[9] Judge Greene declined to rest his opinion on *Shelley* for fear that if, for constitutional purposes, every private right were transformed into governmental action by the mere fact of court enforcement of it, the distinction between private and governmental action would be obliterated. He accepted the reasoning of Mr. Justice Black, who joined in the *Shelley* opinion but has since maintained that its doctrine applies only where, as in *Shelley* itself, the court is called upon to upset a transaction between a willing buyer and a willing seller.[10] Others,

8. The concept of "state action" generally comes into play where there is an alleged denial of the Fourteenth Amendment's equal protection guarantee. State action is also required under the Fifteenth Amendment. The doctrine was born in the Civil Rights Cases, 109 U.S. 3, 11, 3 S.Ct. 18, 27 L.Ed. 835 (1883), and it has been suggested that it has long since died, at least where racial discrimination is involved. *See* Black, *Foreword: "State Action," Equal Protection, and California's Proposition 14*, 81 HARV.L.REV. 69, 84–91 (1967). The "state action" concept is also relevant where First Amendment freedoms are at stake. *See, e. g.,* Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).

9. *Shelley* has been called "constitutional law's *Finnegan's Wake*." Kurland, *Foreword: "Equal in Origin and Equal in Title to the Legislative and Executive Branches of the Government"*, 78 HARV.L.REV. 143, 148 (1964). And many commentators have sought the skeleton key that adequately explains it.

*See, e. g.,* Henklin, Shelley v. Kraemer: *Notes for a Revised Opinion*, 110 U.PA. L.REV. 473 (1962); Lewis, *The Meaning of State Action*, 60 COLUM.L. REV. 1083, 1108–1120 (1960); Pollak, *Racial Discrimination and Judicial Integrity: A Reply to Professor Wechsler*, 108 U.PA.L.REV. 1 (1959). It has also been severely criticized. Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 HARV.L.REV. 1, 29 (1959).

10. Bell v. State of Maryland, 378 U.S. 226, 331, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) (dissenting opinion of Mr. Justice Black). *But see* dissenting opinion of Mr. Justice Douglas in Black v. Cutter Laboratories, 351 U.S. 292, 300, 76 S.Ct. 824, 100 L.Ed. 1188 (1956), in which Mr. Justice Black joined. Professor Pollak, who thinks *Shelley* was rightly decided, would apparently limit it in much the same way. "The line sought to be drawn is that beyond which the state assists a private person in seeing to it that others behave in a fashion which the state could not itself have

however, have urged different interpretations of *Shelley,* ones which would extend its principle beyond its facts but would still leave certain private rights, even when judicially enforced, immune from the Constitution's restraints on government.

Some commentators have suggested that private action is subject to constitutional scrutiny only when the state has encouraged or sanctioned it.[11] Others have gone further and suggested that at least where racial discrimination is involved the state denies the equal protection of the law when it does not act affirmatively to assure equal protection by legislating against privately initiated, as well as governmental, discrimination.[12] But these commentators are careful to point out that *Shelley* should not be read to hold that a state cannot enforce any discrimination which it could not itself make.[13] There is, on this view, unconstitutional action by inaction ex-

ordained. The principle underlying the distinction is this: the fourteenth amendment permits each his personal prejudices and guarantees him free speech and press and worship, together with a degree of free economic enterprise, as instruments with which to persuade others to adopt his prejudices; but access to state aid to induce others to conform is barred." Pollak, *supra* Note 9, at 13.

11. As the Court felt it did in Reitman v. Mulkey, 387 U.S. 369, 377, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Lombard v. State of Louisiana, 373 U.S. 267, 273, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963); Barrows v. Jackson, 346 U.S. 249, 254, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). This is the traditional view sanctioned in the Civil Rights Cases, *supra* Note 8. *But see* United States v. Guest, 383 U.S. 745, 755–756, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); Bullock v. United States, 6 Cir., 265 F.2d 683, *cert. denied*, 360 U.S. 909, 932, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959); Kasper v. Brittain, 6 Cir., 245 F.2d 92, *cert. denied*, 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957); Brewer v. Hoxie School District No. 46, 8 Cir., 238 F.2d 91 (1956). And the state is responsible for the acts of its officials even where the acts are unauthorized or forbidden by law. United States v. Raines, 362 U.S. 17, 25, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) (raising a Fifteenth Amendment state action question); Screws v. United States, 325 U.S. 91, 108, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). It may also be responsible where it permits private bodies to perform an essentially governmental function, Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Terry v. Adams, 345 U.S. 461, 469, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (Fifteenth Amendment); Smith v. Allwright, 321 U.S. 649, 662–663, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (Fifteenth Amendment), or where it owns and leases property to a private body, Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), or where a common carrier's operations are authorized by the state, McCabe v. Atchison, Topeka & Santa Fe Ry. Co., 235 U.S. 151, 161–162, 35 S.Ct. 69, 59 L.Ed. 169 (1914), or where because of private discrimination those discriminated against are denied equal access to governmental benefits. Simkins v. Moses H. Cone Memorial Hospital, 4 Cir., 323 F.2d 959 (1963), *cert. denied*, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964); Derrington v. Plummer, 5 Cir., 240 F.2d 922, 925–926 (1956), *cert. denied*, 353 U.S. 924, 77 S.Ct. 680, 1 L.Ed.2d 719 (1957). The 1964 Civil Rights Act, along with the Supreme Court's interpretation of it in Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed. 2d 300 (1964), have mooted, at least for the time being, the question what, if any, state action is required to bring the Fourteenth Amendment to bear against privately owned public accommodations.

12. *See, e. g.,* Black, *supra* Note 8, at 73–74; Silard, *A Constitutional Forecast: Demise of the "State Action" Limit on the Equal Protection Guarantee,* 66 Colum.L.Rev. 855 (1966); Henkin, *supra* Note 9, at 481–485. The literature on "state action" generally is voluminous. *See* sources cited in footnotes 6 and 34 of Van Alstyne, *Mr. Justice Black, Constitutional Review, and the Talisman of State Action,* 1965 Duke L.Rev. 219, 222 and 231. And more recently, Black, *supra* Note 8; Horowitz and Karst, Reitman v. Mulkey: *A Telophase of Substantive Equal Protection,* 1967 Sup.Ct.Rev. 39.

13. The state court, for instance, could constitutionally probate a will leaving the deceased's property to the Catholic Church, even though the state could not constitutionally make a comparable disposition of its own funds.

cept in those situations where the Constitution itself demands inaction; that is, in those situations where the state could not legislate equality because to do so would impinge on the individual discriminator's countervailing rights of liberty, property and privacy.[14] The state, through its police or courts, could aid an individual in his quest to keep Negroes from a dinner party in his home even though it could not keep Negroes from a courthouse cafeteria[15] or even from a privately owned hotel solely on account of their race. Consequently this theory might dull, but it would not obliterate, the distinction between private and state action.

Were this analysis of state action by inaction under the equal protection clause unqualifiedly applied where the question was governmental action under the First Amendment, there is no doubt that Mrs. Edwards' eviction could not be sustained. Not only would the government have failed to protect her against private reprisals for the exercise of her First Amendment rights (and clearly it could constitutionally protect her if it chose to do so),[16] but it would, through its court, actually be aiding the individual who seeks to intimidate the exercise of those rights.[17] It may be, however, that

what is state action under the Fourteenth Amendment is not always state action under the First. To begin with, the Reconstruction amendments were enacted with a particular purpose in mind: to eradicate forever the vestiges of slavery and the black codes.[18] In addition, the language of the First Amendment, "Congress shall make no law * * *," is not as amenable as the Fourteenth Amendment is to the construction that there is state action by inaction or by judicial action which merely gives legal effect to privately made decisions. Indeed those who have expounded this theory of state action have been careful to limit their case to the area of racial discrimination.[19]

But this does not end the matter. In New York Times Co. v. Sullivan, *supra,* the state of Alabama neither forced nor even encouraged Police Commissioner Sullivan to sue the New York Times. It simply provided courts in which such a suit could be brought, and its common law provided the doctrine upon which the dispute would be settled. There was no suggestion in the Supreme Court's opinion that the doctrine was not fairly and honestly applied by the state court. Yet the Court, hardly pausing even to

14. *See* Black, *supra* Note 8, at 100–103; Henkin, *supra* Note 9, at 487–496.

15. Derrington v. Plummer, *supra* Note 11.

16. Even in its heyday, the state action doctrine did not preclude federal legislation protecting from private interference the exercise of the right to report violations of law. In re Quarles and Butler, 158 U.S. 532, 536, 15 S.Ct. 959, 39 L.Ed. 1080 (1895). Unquestionably such legislation governing merely the District of Columbia would be valid.

17. Given the current state of the law in the District, it is questionable that a landlord could ever evict a resisting tenant without the aid of the courts. *See* Fisher v. Parkwood, Inc., D.C.App., 213 A.2d 757, 759 (1965). And in view of our stay, judicial action to effect an eviction in this case would be indispensable. To some commentators the question of

"state action" turns on whether judicial action was essential to the deprivation of the alleged right. *See, e. g.,* Note, *Landlord and Tenant—Retaliatory Evictions,* 3 Harv.Civ.R.-Civ.Lib.L. Rev. 193, 197–198 (1967). Pollak's view is somewhat similar, *see* Note 10 *supra.*

18. The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 71–72, 21 L.Ed. 394 (1872); Loving v. Commonwealth of Virginia, 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *see also* J., ten-Broek, The Antislavery Origins of the Fourteenth Amendment (1951); Frank and Munro, *The Original Understanding of "Equal Protection of the Laws",* 50 Colum.L.Rev. 131 (1950); Bickel, *The Original Understanding and the Segregation Decision,* 69 Harv.L. Rev. 1 (1955).

19. Black, *supra* Note 8, at 70; Henkin, *supra* Note 9, at 473 n. 2.

consider the question of state action,[20] held that a libel judgment against the Times, on the facts of that case, unconstitutionally abridged the Times' First Amendment rights as incorporated in the Fourteenth Amendment's due process clause. The fact that Congress and the state legislature had "made no law" was apparently irrelevant to this determination.[21]

■ A state court judgment, then, even by adjudicating private lawsuits, may unconstitutionally abridge the right of free speech as well as the right to equal protection of the laws. Of course, the federal court review in *Times* was technically under the due process clause

of the Fourteenth Amendment as it incorporates the First, while here the challenge is made under the First Amendment itself. But there is no reason to think that review under the First Amendment is more limited.[22] In any case, review under the Fifth Amendment's due process clause would not be. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). And it may be that the more flexible concept of due process is preferable where the question is one involving First Amendment rights and the government, though perhaps sufficiently implicated in the abridgement to bring into play constitutional constraints, is not directly responsible

**20.** "We may dispose at the outset of two grounds asserted to insulate the judgment of the Alabama courts from constitutional scrutiny. The first is the proposition relied on by the State Supreme Court—that 'The Fourteenth Amendment is directed against State action and not private action.' That proposition has no application to this case. Although this is a civil lawsuit between private parties, the Alabama courts have applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press. It matters not that that law has been applied in a civil action and that it is common law only, though supplemented by statute. *See, e. g.,* Alabama Code, Tit. 7, §§ 908–917. The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised. * * *" 376 U.S. at 265, 84 S.Ct. at 718.

**21.** It was enough that a common law rule was applied to mediate conflicting claims of right between private parties. Though highly relevant to the Court's decision on the merits, the fact that the plaintiff was a state official was not a factor in the Court's determination that there was reviewable state action. For an excellent discussion of the state action implications of *New York Times, see* Van Alstyne, *supra* Note 12, at 227–230.

**22.** It is of course true that the First Amendment explicitly proscribes only congressional action. But at least as incorporated into the Fourteenth, it invalidates any "state action" which abridges the freedoms it protects. Action by a state legislature is not required.

*See* New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710 (1964). There is no more reason to require congressional action where the challenge is made under the First Amendment itself. As Mr. Justice Black put it: "The First and Fourteenth Amendments, I think, take away from *government*, state and *federal*, all power to restrict freedom of speech, press, and assembly * * *." Cox v. State of Louisiana, 379 U.S. 536, 578, 85 S.Ct. 453, 468, 13 L.Ed.2d 471 (1965) (concurring and dissenting opinion). (Emphasis added.) *Compare* Hurd v. Hodge, *supra* Note 5, 334 U.S. at 35, 68 S.Ct. at 853: "It is not consistent with the public policy of the United States to permit federal courts in the Nation's capital to exercise general equitable powers to compel action denied the state courts where such state action has been held to be violative of the guaranty of the equal protection of the laws." Of course there are acts of Congress, 45 D.C.CODE §§ 902 and 910, 16 D.C.CODE § 1501, at play in the instant case. But to say that these statutes, as applied here, might be unconstitutional would be an accurate but artificial way of putting the issue. In general, the statutes simply provide the landlord with a judicial mechanism for achieving what he could traditionally accomplish by self-help. They say nothing about what if any defenses are available to the tenant. Consequently a more informative way of framing the question would be: Is it unconstitutional for the court not to permit a defense under them that eviction is sought in retaliation for the exercise of First Amendment rights? Indeed, rights of federal citizenship? *See* text *infra,* Part II.

for it. It may be instructive to borrow again from other state action theorists whose analyses, though concerned primarily with racial discrimination, are somewhat less rigid and therefore may transfer more comfortably from the area of racial discrimination under the Fourteenth Amendment into the context of First Amendment rights.

It has been suggested that there is state action, not only when an individual asserts a claim of right against a state, but also when he asserts a claim of right against the claims of right of other persons and the state resolves the conflict according to its policy of what is reasonable under the circumstances, i. e., according to its law.[23] Once this "state action" is established, the question then becomes simply "whether the particular state action in the particular circumstances, determining legal relations between private persons, is constitutional when tested against the various federal constitutional restrictions on state action."[24]

The question in the instant case would then be whether a court can consistently with the Constitution prefer the interests of an absentee landlord[25] in evicting a tenant solely because she has reported violations of the housing code to those of a tenant in improving her housing by resort to her rights to petition the government and to report violations of laws designed for her protection. On this theory, if it would be unreasonable to prefer the landlord's interest, it would also be unconstitutional.[26] Mr. Justice Black, who is not prone to weigh interests where First Amendment rights are involved,[27] seems to have taken just this approach in writing for the Court in Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), which, like the instant case, involved state-aided privately-initiated, abridgement of First Amendment freedoms.[28]

23. Van Alstyne, *supra* Note 12, at 241–245; Horowitz, *Fourteenth Amendment Aspects of Racial Discrimination in "Private" Housing*, 52 .CALIF.L.REV. 1 (1964); Williams, *The Twilight of State Action*, 41 TEXAS L.REV. 347 (1963); Van Alstyne and Karst, *State Action*, 14 STAN.L.REV. 3 (1961); Horowitz, *The Misleading Search for "State Action" Under the Fourteenth Amendment*, 30 SO.CAL.L.REV. 208 (1957).

24. Horowitz, *The Misleading Search for "State Action" Under the Fourteenth Amendment*, *supra* Note 23, at 209.

25. The fact that Mrs. Edwards is not in any sense a boarder in Mr. Habib's home would, on this theory, be relevant in assessing his interest in associating with whom he pleases. *Compare* Appendix I to Mr. Justice Douglas' concurring opinion in Bell v. State of Maryland, *supra* Note 10, 378 U.S. at 261–271, 84 S.Ct. 1814.

26. If Congress had made an unambiguous judgment that in the context of the instant case the landlord's interests were to be preferred to the tenant's, this court would owe that judgment great deference, more than the Supreme Court would owe comparable judgments of state legislatures. If, however, the statute was unclear, we would owe no deference to the DCCA's interpretation of it, while the Supreme Court would defer to a comparable construction by a state court of a state statute.

27. *See, e. g.*, his dissenting opinions in Konigsberg v. State Bar, 366 U.S. 36, 56, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Braden v. United States, 365 U.S. 431, 438, 81 S.Ct. 584, 5 L.Ed.2d 653 (1961); Barenblatt v. United States, 360 U.S. 109, 134, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Dennis v. United States, 341 U.S. 494, 579, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). *See also* Black, *The Bill of Rights*, 35 N.Y.U.L.REV. 865 (1960).

28. Mr. Justice Black will also apparently resort to a balancing approach where he perceives "speech plus" as he did in Cox v. State of Louisiana, *supra* Note 22, 379 U.S. at 578, 85 S.Ct. at 468 "[T]his Court does, and I agree that it should, 'weigh the circumstances' in order to protect, not to destroy, freedom of speech, press, and religion." If there is ever such a thing as "speech pure" (*see* Kalven, *The Concept of the Public Forum:* Cox v. Louisiana, 1965 SUP.CT. REV. 1, 23–25), we have it in the instant case. For Mrs. Edwards' speech itself does not interfere in any way with the legitimate property interests of her landlord or anyone else. The question on this theory would simply be whether it is

The question before the Court in *Marsh* was "whether a State, consistently with the First and Fourteenth Amendments, can impose criminal punishment on a person who undertakes to distribute religious literature on the premises of a company-owned town contrary to the wishes of the town's management." 326 U.S. at 502, 66 S.Ct. at 277. In answering it, Mr. Justice Black felt compelled to "balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion" and in doing so remained mindful "of the fact that the latter occupy a preferred position." 326 U.S. at 509, 66 S.Ct. at 280. He concluded that the state acted unconstitutionally in preferring the property rights of the town's owners to those of the defendant and the town's residents[29] through the application of its criminal trespass statute to Mrs. Marsh. "Insofar as the State has attempted to impose criminal punishment on appellant for undertaking to distribute religious literature in a company town, its action cannot stand." *Ibid.*

Again it should be remembered that in *Times* the state did not initiate the action, nor did it encourage the private parties involved to do so. And in *Marsh*

there could have been no prosecution without a private complaint. In both cases the state simply provided courts and laws to settle essentially private disputes.[30] Where its settlement impinged on First Amendment freedoms, a balancing process was utilized on review to determine whether it did so unconstitutionally.[31] But we need not undertake such a weighing of interests here or even decide if such a process is appropriate, for we find, as indicated in Part III, that Congress, by directing the enactment of the housing code, impliedly directed the court to prefer the interests of the tenant who seeks to avail himself of the code's protection.

## II

Appellant argues that, even if *Shelley* and the concept of "state action" are interpreted narrowly, and if the judicial implementation of the D.C. Code to effect a retaliatory eviction does not violate her First Amendment rights, her eviction would be unconstitutional nonetheless because the right to petition the government and to report violations of law is constitutionally protected against private as well as governmental interference. There is strong support for this position. In Crandall v. State of

unreasonable for the government not to limit property rights by forbidding retaliatory evictions in order to protect the tenant's right to report housing code violations.

29. Just as the interests of the company town's residents were considered by the Court in *Marsh*, so here the interests of other tenants who would be deterred from seeking to improve their housing by reporting code violations to the authorities would have to be considered in deciding whether Mrs. Edwards' eviction would be reasonable.

30. *See also* American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941), where the Supreme Court struck down an Illinois statute which gave employers the right to secure an injunction against picketing of their shops when there was no existing dispute between the employer and his employees. Nothing in the statute required or encouraged the employer to utilize

the injunctive mechanism at his disposal. If he wished to permit such picketing he was free to do so. Consequently any decision to impair the alleged First and Fourteenth Amendment rights of the pickets was solely that of a private party, not that of the state. *Swing* was cited and relied upon in Shelley v. Kraemer, 334 U.S. 1, 17, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). The case is discussed in Van Alstyne, *supra* Note 12, at 226–227. *See also* Mr. Justice Harlan's concurring and dissenting opinion in Peterson v. City of Greenville, 373 U.S. 244, at 249, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963).

31. The balance where First and Fourteenth Amendment rights are involved may be different. The individual's interest in being free to choose his associates on the basis of what they do or say may be entitled to more weight than such choices made on the basis of what they are, *i. e.*, on the basis of race.

Nevada, 73 U.S. (6 Wall.) 35, 18 L.Ed. 744 (1868), decided before the Fourteenth Amendment was enacted, the Court struck down Nevada's one-dollar tax on anyone leaving the state in part because the Court felt that such a tax might infringe the individual's right to travel to Washington to participate in, and seek redress from, the government. And in United States v. Cruikshank, 92 U.S. (2 Otto) 542, 23 L.Ed. 588 (1876), in dictum [32] and in In re Quarles and Butler, 158 U.S. 532, 15 S.Ct. 959, 39 L. Ed. 1080 (1895), as holding, the Court was even more explicit in recognizing the right to petition the government for redress of grievances and the right to inform the government of violations of law as rights of federal citizenship arising from our constitutional system as a whole, not just from the First Amendment or from any other particular constitutional clause or provision. In *Quarles* the Supreme Court affirmed the conviction under the Civil Rights Act of a private citizen for conspiring to "injure, oppress, threaten, or intimidate

[another] in the free exercise * * * of [a] right * * * secured to him by the Constitution or laws of the United States, or because of his having so exercised the same." [33] The defendant and his accomplices had threatened and beaten one Worley for informing federal officers that the defendant was violating the federal liquor law. The defendant argued that Worley had no right to inform that was protectable against private interference. But the Court rejected this argument, stating that:

"The right of a citizen informing of a violation of law, like the right of a prisoner in custody upon a charge of such violation, to be protected against lawless violence, does not depend upon any of the Amendments to the Constitution, but arises out of the creation and establishment by the Constitution itself of a national government, paramount and supreme within its sphere of action. * * *

"* * * [As the Court said in Ex parte Yarbrough, 110 U.S. 651, 662, 4 S.Ct. 152, 28 L.Ed. 274

---

32. *Cruikshank* involved a prosecution under § 6 of the Enforcement Act of May 31, 1870, 16 Stat. 141 (now, as amended, 18 U.S.C. § 241 (1964 ed.)), which made it a felony for two or more persons to "band or conspire together * * * with intent to * * * injure, oppress, threaten, or intimidate any citizen, with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the constitution or laws of the United States, or because of his having exercised the same * * *." On a motion in arrest of judgment after a verdict of guilty, the Supreme Court found all counts of the indictment defective because they did not allege action by the state and thus the conspiracy was beyond the reach of federal law. But, the Court said, "If it had been alleged in these counts that the object of the defendants was to prevent a meeting for such a purpose [that of consulting in respect to public affairs and to petition the government for redress of grievances], the case would have been within the statute, and within the scope of the sovereignty of the United States." For the right to assemble for these purposes "is an attribute of national citizenship,

and, as such, under the protection of, and guaranteed by, the United States." Because the right arose not simply from the Bill of Rights but from "the very idea of government, republican in form," they could be protected against private as well as official interference. 92 U.S. (2 Otto) at 552–553. *See also* United States v. Classic, 313 U.S. 299, 315, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892); United States v. Waddell, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884); Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884). For a thoughtful analysis of congressional power under § 5 of the Fourteenth Amendment, *see* Cox *Foreword: Constitutional Adjudication and the Promotion of Human Rights*, 80 Harv.L.Rev. 91 (1966). On the development of federal power generally, *see* R. Carr, Federal Protection of Civil Rights (1947); H. Cummings & C. McFarland, Federal Justice (1937); 2 T. Emerson, D. Haber & N. Dorsen, Political and Civil Rights in the United States, Ch. XV, Sec. D (1967).

33. Section 5508, Revised Statutes 1874–1878, now, as amended, 18 U.S.C. § 241.

(1884)]: 'The power [to protect certain rights from private interference] arises out of the circumstance that the function in which the party is engaged, or the right which he is about to exercise, is dependent on the laws of the United States. * * * [I]t is the duty of that government to see that he may exercise this right freely, and to protect him from violence while so doing, or on account of so doing. This duty does not arise solely from the interest of the party concerned, but from the necessity of the government itself * * *.

* * * * * *

"The necessary conclusion is * * that this right is secured to the citizen by the Constitution of the United States * * *." 158 U.S. at 536–537, 15 S.Ct. at 961.

This right, appellant argues, is accordingly protected against private as well as governmental interference.[34] It is on the basis of this theory that Judge Greene found that proof of a retaliatory purpose constituted a valid defense.

But though this argument from *Quarles* is persuasive, it is not conclusive, for at issue in *Quarles* was the applicability and constitutionality of the Civil Rights Act to punish private interferences with the right to report violations of law, not the questions, first, whether such interferences were themselves unconstitutional in the absence of remedial legislation, and second, if unconstitutional, what legal consequences attached to them. The DCCA rejected the argument for just this reason, saying that *Quarles* was a case where "Congress enacted special legislation to secure certain rights." 227 A.2d at 391. Presumably the legislation referred to is the Civil Rights Act, and the DCCA apparently felt that current civil rights statutes would not apply to this case. But the enforcement section of the Civil Rights Act provided remedies for the deprivation of rights secured by the Constitution or laws of the United States. It did not create new rights. And the Supreme Court held in *Quarles* that the right to report violations of law was a constitutional right protectable by federal legislation against private interference, not that it was itself a right created by the Civil Rights Act. It is this constitutional right that Mrs. Edwards is setting up as a defense to the landlord's action of eviction. It is not necessarily relevant, therefore, that because of the peculiar requirements of the civil rights statutes they may not provide her with additional affirmative civil[35] or criminal remedies[36] for violation of the same right.[37]

---

34. Federal law can protect such rights (at least the right to vote) from privately exercised economic intimidation as well as from more violent forms of coercion. The current civil rights statutes do just that. *See* United States v. Beaty, *supra* Note 5. Even "conduct that might be perfectly legal, if not colored by the bad intent of interfering with the right to [register and] vote" may become "illegal upon proof of such illegal intent." United States v. Bruce, *supra* Note 5, 353 F.2d at 476, where the intimidation took the form of a conspiracy by landlords to invoke the state trespass laws to keep one Brown, a Negro insurance collector, from reaching many of his policyholders who were tenants on their land. Brown had been active in urging his friends and neighbors to vote and the court felt that the allegations of the complaint, which had been dismissed below, made a showing from which it could be inferred that the landlords' ban of Brown was in reprisal for his participation in the voter registration drive. *See also* United States by Katzenbach v. Original Knights of the Ku Klux Klan, E.D.La., 250 F.Supp. 330 (1965), and cases discussed therein.

35. 42 U.S.C. § 1983 (1964 ed.) establishes a right of action for the deprivation of any "rights, privileges, or immunities secured by the Constitution and laws" only against persons acting under color of law. And only under color of the law of a state or territory. Gregoire v. Biddle, 2 Cir., 177 F.2d 579, 581 (1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950). 42 U.S.C. § 1985(3) (1964 ed.), which establishes a right of action against inter-

---

36. See note 36 on page 699.

---

37. See note 37 on page 699.

## III

But we need not decide whether judicial recognition of this constitutional defense is constitutionally compelled. We need not, in other words, decide whether 45 D.C. CODE § 910 could validly compel the court to assist the plaintiff in penalizing the defendant for exercising her constitutional right to inform the govenment of violations of the law; for we are confident that Congress did not intend it to entail such a result.

45 D.C. CODE § 910, in pertinent part, provides:

"Whenever * * * any tenancy shall be terminated by notice as aforesaid [45 D.C. CODE § 902, see Note 1 supra], and the tenant shall fail or refuse to surrender possession of the leased premises, * * * the landlord may bring an action to recover possession before the District of Columbia Court of General Sessions, as provided in sections 11–701 to 11–749."

And 16 D.C. CODE § 1501, in pertinent part, provides:

"When a person detains possession of real property * * * after his right to possession has ceased, the District of Columbia Court of General Sessions * * * may issue a summons to the party complained of to appear and show cause why judgment should not be given against him for restitution of possession."

These provisions are simply procedural. They neither say nor imply anything about whether evidence of retaliation or other improper motive should be unavailable as a defense to a possessory action brought under them. It is true that in making his affirmative case for possession the landlord need only show that his tenant has been given the 30-day statutory notice, and he need not assign any reason for evicting a tenant who does not occupy the premises under a lease. But while the landlord may evict for any legal reason or for no reason at all, he is not, we hold, free to evict in retaliation for his tenant's report of housing code violations to the authorities.[38] As a matter of statutory construction and for reasons of public policy,[39] such an eviction cannot be permitted.

---

ference or intimidation by private individuals, requires a conspiracy by two or more persons.

36. 18 U.S.C. § 241 which provides criminal penalties for interference with rights or privileges secured by the Constitution or laws of the United States requires a conspiracy, while 18 U.S.C. § 242 (1964 ed.) penalizes only those acting under color of law. (Section 242 is not, however, limited to those acting under the law of a state or territory.)

37. As with Shelley, there are, conceivably, problems in containing the Quarles doctrine. Could, for instance, a landlord invite all his tenants to dinner except those who had complained of housing code violations? Again the landlord's countervailing constitutional rights of privacy and association may be the cutting edge. Or perhaps such petty slights do not rise to the level of intimidation, coercion, interference or punishment. Finally, as Judge Greene pointed out, appellant is simply setting up her constitutional right as a defense, and is not seeking affirmative relief based on it.

38. In L'Orange v. Medical Protective Co., 6 Cir., 394 F.2d 57 (1968), the Sixth Circuit held that a malpractice insurer could not cancel the policy of an Ohio dentist simply because the insured testified in a malpractice suit against a colleague insured by the same company. Presumably the policy could have been cancelled for any lawful reason or for no reason at all, but it could not be cancelled for the purpose of intimidating a witness in contravention of Ohio's public policy. See also Petermann v. International Brotherhood of Teamsters, etc., Local 396, 174 Cal.App.2d 184, 344 P.2d 25 (1959), which held that a union could not fire one of its employees even though there was no fixed term of employment if the reason for the dismissal of the employee was his refusal to give false testimony before a legislative investigating committee. Such a dismissal, it was held, contravened California's policy against perjury.

39. Compare Hurd v. Hodge, supra Note 5, 334 U.S. at 34–35, 68 S.Ct. at 852–853: "But even in the absence of the

The housing and sanitary codes,[40] especially in light of Congress' explicit direction for their enactment, indicate a strong and pervasive congressional concern to secure for the city's slum dwellers decent, or at least safe and sanitary, places to live.[41] Effective implementation and enforcement of the codes obviously depend in part on private initiative in the reporting of violations. Though there is no official procedure for the filing of such complaints, the bureaucratic structure of the Department of Licenses and Inspections establishes such a procedure,[42] and for fiscal year 1966 nearly a third of the cases handled by the Department arose from private complaints.[43] To permit retaliatory

statute, there are other considerations which would indicate that enforcement of restrictive covenants in these cases is judicial action contrary to the public policy of the United States, and as such should be corrected by this Court in the exercise of its supervisory powers over the courts of the District of Columbia. The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents." (Footnotes omitted.)

40. The District Commissioners have promulgated extensive housing regulations which require landlords to keep their premises in "clean, safe and sanitary condition." HOUSING REGULATIONS OF THE DISTRICT OF COLUMBIA, §§ 2101, 2304 (1956). The purpose of the Regulations is set forth in § 2101:

"The Commissioners of the District of Columbia hereby find and declare that there exist residential buildings and areas within said District which are slums or are otherwise blighted, and that there are, in addition, other such buildings and areas within said District which are deteriorating and are in danger of becoming slums or otherwise blighted unless action is taken to prevent their further deterioration and decline.

"The Commissioners further find and declare that such unfortunate conditions are due, among other circumstances, to certain conditions affecting such residential buildings and such areas, among them being the following: dilapidation, inadequate maintenance, overcrowding, inadequate toilet facilities, inadequate bathing or washing facilities, inadequate heating, insufficient protection against fire hazards, inadequate lighting and ventilation, and other insanitary or unsafe conditions.

"The Commissioners further find and declare that the aforesaid conditions, where they exist, and other conditions .

which contribute to or cause the deterioration of residential buildings and areas, are deleterious to the health, safety, welfare and morals of the community and its inhabitants."

41. "The Commissioners of the District of Columbia, are authorized and directed to make and enforce such building regulations for the said District as they may deem advisable.

"Such rules and regulations made as above provided shall have the same force and effect within the District of Columbia as if enacted by Congress." 1 D.C.CODE § 228 (1967). *See also* 1 D.C.CODE § 226 (1967); 5 D.C.CODE § 701 (1967).

These functions were transferred without change to the District of Columbia Council pursuant to Reorganization Plan No. 3 of 1967, 32 FED.REG. 11669, 11672 (1967), U.S. CODE CONG. & ADMIN. NEWS 1967, p. 3537. *See also* 1 D.C.CODE §§ 224a, 226 (1967); 5 D.C.CODE § 616 (1967); 47 D.C.CODE § 2328 (1967); Whetzel v. Jess Fisher Management Co., 108 U.S.App.D.C. 385, 282 F.2d 943 (1960). Congress' concern with housing conditions and housing code enforcement generally is evidenced in 42 U.S.C. §§ 1441 (1964 ed.), 1451(c), 1468 (Supp. II 1965–66). *See also* Schoshinski, *Remedies of the Indigent Tenant: Proposal for Change*, 54 GEO.L.J. 519, 525–526 (1966).

42. Reorganization Order No. 55, Part III, C., 6., 1 D.C.CODE, Appendix, at 137 (1967).

43. Of 47,701 cases handled, almost 15,000 were initiated by private complaint. *See* HEARINGS BEFORE THE SUBCOMMITTEE ON BUSINESS AND COMMERCE OF THE SENATE COMMITTEE ON THE DISTRICT OF COLUMBIA ON S. 2331, S. 3549 AND S. 3558, 89th Cong., 2d Sess., at 52 (1966). And the need for increased private and group participation in code enforcement has been widely recognized. Gribetz and Grad, *Housing Code Enforcement: Sanctions and Remedies*, 66 COLUM.L. REV. 1254 (1966); Note, *Enforcement of Municipal Housing Codes*, 78 HARV.

evictions, then, would clearly frustrate the effectiveness of the housing code as a means of upgrading the quality of housing in Washington.[44]

As judges, "we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men." Ho Ah Kow v. Nunan, C.C.D.Cal., 12 Fed.Cas. 252, 255 (No. 6546) (1879). In trying to effect the will of Congress and as a court of equity we have the responsibility to consider the social context in which our decisions will have operational effect. In light of the appalling condition and shortage of housing in Washington,[45] the expense of moving, the inequality of bargaining power between tenant and landlord,[46] and the social and economic importance of assuring at least minimum standards in housing conditions,[47] we do not hesitate to declare that retaliatory eviction cannot be tolerated. There can be no doubt that the slum dweller, even though his home be marred by housing code violations, will pause long before he complains of them if he fears eviction as a consequence. Hence an eviction under the circumstances of this case would not only punish appellant for making a complaint which she had a constitutional right to make, a result which we would not impute to the will of Congress simply on the basis of an essentially procedural enactment, but also would stand as a warning to others that they dare not be so bold, a result which, from the authorization of the housing code, we think Congress affirmatively sought to avoid.

The notion that the effectiveness of remedial legislation will be inhibited if those reporting violations of it can legally be intimidated is so fundamental that a presumption against the legality of such intimidation can be inferred as

L.Rev. 801, 843–860 (1965). *See also* Sax and Hiestand, *Slumlordism as a Tort,* 65 Mich.L.Rev. 869 (1967).

**44.** Hearings, *supra* Note 43, at 23, 90–114, 142–155, 192–196.

**45.** *See Report of the National Capital Planning Commission, Problems of Housing People in Washington, D. C.,* reprinted in Hearings, *supra* Note 43, at 410:
> "* * * Poor families are responding to Washington's housing shortage by doubling and overcrowding; by living in structurally substandard or other hazardous housing; by sharing or doing without hot water, heat, light, or kitchen or bathroom facilities; by farming out their children wherever they can; by denying their children exist to landlords and public officials; by paying rents which are high compared to incomes so they must sacrifice other living necessities; and by living without dignity or privacy. Each one of these features has been measured separately or has been observed in Washington's poverty areas."

*See also* Schoshinski, *supra* Note 41, at 519 *ff.*

**46.** *See* Kay v. Cain, 81 U.S.App.D.C. 24, 25, 154 F.2d 305, 306 (1946).

**47.** "Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river." Berman v. Parker, 348 U.S. 26, 32–33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954). *See also* Frank v. State of Maryland, 359 U.S. 360, 371, 79 S.Ct. 804, 811, 3 L.Ed.2d 877 (1959): "The need to maintain basic, minimal standards of housing, to prevent the spread of disease and of that pervasive breakdown in the fiber of a people which is produced by slums and the absence of the barest essentials of civilized living, has mounted to a major concern of American government."

According to the *Report of the Planning Commission, supra* Note 45, at pp. 5–6, "more than 100,000 children are growing up in Washington now under one or more housing conditions which create psychological, social, and medical impairments, and make satisfactory home life difficult or a practical impossibility." Reprinted in Hearings, *supra* Note 43, at 410.

inherent in the legislation even if it is not expressed in the statute itself.[48] Such an inference was recently drawn by the Supreme Court from the federal labor statutes to strike down under the supremacy clause a Florida statute denying unemployment insurance to workers discharged in retaliation for filing complaints of federally defined unfair labor practices.[49] While we are not confronted with a possible conflict between federal policy and state law, we do have the task of reconciling and harmonizing two federal statutes so as to best effectuate the purposes of each.[50] The proper balance can only be struck by interpreting 45 D.C. Code §§ 902 and 910 as inapplicable where the court's aid is invoked to effect an eviction in retaliation for reporting housing code violations.[51]

This is not, of course, to say that even if the tenant can prove a retaliatory purpose she is entitled to remain in possession in perpetuity. If this illegal purpose is dissipated, the landlord can, in the absence of legislation[52] or a binding contract, evict his tenants or raise their rents for economic or other legitimate reasons, or even for no reason at all.[53] The question of permissible or impermissible purpose is one of fact for the court or jury, and while such a determination is not easy, it is not significantly different from problems with

**48.** *See, e. g.*, John Hancock Mutual Life Ins. Co. v. N. L. R. B., 89 U.S.App.D.C. 261, 264, 191 F.2d 483, 486 (1951): 'Under petitioner's view, the Act [Labor Management Relations Act, now 29 U.S.C. §§ 151 *et seq.* (1964 ed.)] would permit denial of employment to an applicant * * * on the ground that he had filed charges or given testimony before the Board. [This would] * * * thwart the administration of the Act itself by ignoring the ever present threat of such intimidation. Such a reading of the Act would be a perversion of legislative intent.''

**49.** Nash v. Florida Industrial Commission, 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967). *See also* Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 231, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and its companion case, Compco Corp. v. Day-Brite Lighting, 376 U.S. 234, 237–238, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

**50.** *See, e. g.*, United States v. Borden Co., 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939); Rawls v. United States, 8 Cir., 331 F.2d 21, 28 (1964). When Congress enacted 45 D.C.Code §§ 902 and 910, it did not have in mind their possible use in effectuating retaliatory evictions. Indeed, when they were enacted there was no housing code at all. And in all probability Congress did not attend to the problem of retaliatory evictions when it directed the enactment of the housing code. Our task is to determine what Congress would have done, in light of the purpose and language of the statute, had it confronted the question now before the court. And where there is a possible conflict, the more recent enactment, the housing code, should

be given full effect while leaving an area of effective operation for the earlier statute. International Union of Electrical, Radio, etc., Workers v. N. L. R. B., 110 U.S.App.D.C. 91, 95, 289 F.2d 757, 761 (1960). This task, we think, our resolution of the issue accomplishes.

**51.** In a recent important decision the DCCA has held that as a matter of public policy a landlord who has rented housing space knowing that it contained housing code violations could not collect back rent from his ex-tenant. Brown v. Southall Realty Co., D.C.App., 237 A.2d 834 (1968).

**52.** There have been several bills introduced in Congress which deal expressly with the problem of retaliatory evictions. Hearings were held in the Senate, *see* Note 43 *supra*, on three bills but none was reported out of committee. H.R. 257, 90th Cong., 1st Sess. (1967), is now before the House Committee on the District of Columbia. Its companion bill, S. 1910, 90th Cong., 1st Sess. (1967), has been introduced in the Senate. The bill would forbid an eviction, except for specified reasons, during the nine months following the filing of a complaint. The proposed legislation is discussed in Note, *Retaliatory Evictions and the Reporting of Housing Code Violations in the District of Columbia*, 36 G.W.L.Rev. 190, 196–203 (1967). *See also* the suggestion for judicial implementation in Note, *Landlord and Tenant—Retaliatory Evictions*, *supra* Note 17, at 205–208.

**53.** Of course, because of his prior taint the landlord may not be able to disprove an illicit motive unless he can show a legitimate affirmative reason for eviction.

which the courts must deal in a host of other contexts, such as when they must decide whether the employer who discharges a worker has committed an unfair labor practice because he has done so on account of the employee's union activities.[54] As Judge Greene said, "There is no reason why similar factual judgments cannot be made by courts and juries in the context of economic retaliation [against tenants by landlords] for providing information to the government."

Reversed and remanded.

McGOWAN, Circuit Judge (concurring except as to Parts I and II):

The considerations bearing upon statutory construction, so impressively marshalled by Judge Wright in Part III of his opinion, have made it unnecessary for me to pursue in any degree the constitutional speculations contained in Parts I and II; and it is for this reason that I do not join in them. The issue of statutory construction presented in this case has never seemed to me to be a difficult one, nor to require for its resolution the spur of avoidance of constitutional questions. A Congress which authorizes housing code promulgation and enforcement clearly cannot be taken to have excluded retaliatory eviction of the kind here alleged as a defense under

a routine statutory eviction mechanism also provided by Congress.

DANAHER, Circuit Judge (dissenting):

Basically at issue between my colleagues and me is a question as to the extent to which the power of the court may here be exercised where by their edict the landlord's right to his property is being denied. They concede as they must [1]

"that in making his affirmative case for possession the landlord need only show that his tenant has been given the 30-day statutory notice, and he need not assign any reason for evicting a tenant who does not occupy the premises under a lease."

That fundamental rule of our law of property must give way, it now develops. My colleagues so rule despite the absence of a statutory prescription of discernible standards as to what may constitute "violations," or of provision for compensating[2] the landlord for the deprivation of his property. They say that the court will not "frustrate the effectiveness of the housing code as a means of upgrading the quality of housing in Washington." Since they recognize that there is an "appalling condition and shortage of housing in Washington," [3]

---

54. *See, e. g.*, John Hancock Mutual Life Ins. Co. v. N. L. R. B., *supra* Note 48. And under 42 U.S.C. § 1971(b) (1964 ed.), the court must decide whether economic pressures otherwise lawful are illegal because designed to intimidate the exercise of the right to vote in a federal election. *See* United States v. Beaty, *supra* Note 5; United States v. Bruce, *supra* Note 5. *See also* United States v. Board of Education of Greene County, Miss., 5 Cir., 332 F.2d 40 (1964); L'Orange v. Medical Protective Co., *supra* Note 38; Petermann v. International Brotherhood of Teamsters, etc., Local 396, *supra* Note 38.

1. *See generally*, 45 D.C.CODE §§ 902, 910 (1967) and 16 D.C.CODE § 1501 (1967).

2. Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) held for the

first time that the government here might condemn one's property and turn it over to another private "person"— *but not without due process, not without compensation.*

3. It is common knowledge that following Berman v. Parker, *supra* note 2, the housing structures in one entire quadrant of the City of Washington were razed, driving thousands of tenants to seek whatever "appalling" accommodations they could find. In place of the destroyed housing, beautiful apartment buildings have been built, to be sure, with "co-ops" in some costing up to $100,000 per apartment, with rentals in others priced far beyond the capacity to pay of thousands of those who had been displaced. And even the affluent tenants having chosen to do so, must be presumed, at least until now, to have

they say the court must take account of the "social and economic importance of assuring at least minimum standards in housing conditions." So to meet such needs, the burden would now be met, not pursuant to a congressionally prescribed policy, with adequate provision for construction or acquisition costs, or for compensation to property owners, but by private landlords who will be saddled with what should have been a public charge.

Note how my colleagues achieve that result as they rule:

"But while the landlord may evict for any legal reason or for no reason at all, he is not, we hold, free to evict in retaliation for his tenant's report of housing code violations to the authorities. As a matter of statutory construction and for reasons of public policy, such an eviction cannot be permitted."

Just as do my colleagues, I deplore the effort of any landlord for a base reason to secure possession of his own property, but if his right so to recover in accordance with our law is to be denied, Congress should provide the basis. Appropriate standards as a pre-condition thus could be spelled out in legislation and just compensation thereupon be awarded if found to be due.[4]

I am not alone in my position, I dare say, as I read the Congressional Record for March 13, 1968, page H 1883. In

President Johnson's message to the Congress he said:

"One of the most abhorrent injustices committed by some landlords in the District is to evict—or threaten to evict—tenants who report building code violations to the Department of Licenses and Inspections.

"This is intimidation, pure and simple. It is an affront to the dignity of the tenant. It often makes the man who lives in a cold and leaking tenement afraid to report those conditions.

"Certainly the tenant deserves the protection of the law when he lodges a good faith complaint.

"*I recommend legislation to prevent retaliatory evictions by landlords in the District.*" (Emphasis added.)

He seems to think as do I that congressional action is required.[5] It may be doubted that the President would so have recommended legislation except upon the advice of the legal authorities upon whom he relies. Certainly he is aware of the due process protective considerations which must be accorded to a landlord, even one who might be guilty of "an affront to the dignity" of a tenant. He must know that a community burden is not to be borne alone by landlords, charged with allegedly "retaliatory"[6] evictions because of complaints

---

taken the premises in the condition in which they found them, cockroaches and all.

The Washington Post on April 1, 1968 editorialized upon the need for a renewal project after "the wholesale bulldozing of slums and massive uprooting of families with them which characterized the Southwest development."

4. As Chief Judge Hood observed, writing for a unanimous District of Columbia Court of Appeals: "If, as some believe, the law relating to landlords and tenants is outdated, it should be brought up-to-date by legislation and not by court edict." Edwards v. Habib, 227 A.2d 388, 392 (1967). In note 10, *id.*, he quoted from Collins v. Hardyman, 341 U.S. 651, 663, 71 S.Ct. 937, 942, 95 L.Ed.2d 1253

(1951), "It is not for this Court to compete with Congress or attempt to replace it as the Nation's law-making body."

5. Chief Judge Hood has traced out certain references to action already under way in Congress relating to the type of situation said to be present here. Edwards v. Habib, *supra* note 4, 227 A.2d at 390–91. And see the majority opinion, n. 51.

6. For background and as a matter of convenient reference, let it be noted that Edwards and Habib entered into a monthly tenancy agreement as of March 24, 1965. The tenant paid one month's rent in advance, and, of course, took the premises as she found them. The agreement provided that failure thereafter to pay the rental in advance would constitute a default and that the agreement

of "violations," undefined and vague and lacking in standards.

That my colleagues ultimately upon reflection began to doubt the sufficiency of their position seems clear enough, for they observe:

"This is not, of course, to say that *even if the tenant can prove a retaliatory purpose* she is entitled to remain in possession in perpetuity." (Emphasis added.)

"Of course" *not,* I say; *not at all* as the law has read, until now, I may add. My colleagues continue:

"If this illegal purpose is dissipated, the landlord can, in the absence of legislation or a binding contract, evict his tenants or raise their rents for economic or other legitimate reasons, or even for no reason at all."

And so, it may be seen according to the majority, we need never mind the Congress, the aid of which the *President* would invoke. We may disregard, even reject, our law of such long standing. We will simply leave it to a jury to say when a landlord may regain possession of his own property, although "the determination is not easy," my colleagues concede.[7]

I leave my colleagues where they have placed themselves.

---

was to operate as a notice to quit and that the statutory 30 days' notice to quit was expressly waived. Repeatedly thereafter the tenant was in default of payment of the rental. As of October 11, 1965, neither the appellant nor her counsel appeared in the Landlord-Tenant Branch of the Court of General Sessions. A later motion to reopen a default judgment was granted, a two-day trial followed, and a directed verdict for the landlord was entered.

This court was asked to stay the judgment after the District of Columbia Court of Appeals refused to do so. I then dissented from this court's order for reasons set forth in Edwards v. Habib, 125 U.S.App.D.C. 49, 51, 366 F.2d 628, 630 (1965), to which I now refer. In the meanwhile, time and again, further defaults occurred with resulting harassment and vexation to the landlord which this court as often overlooked.

The landlord is still without possession of his property which should have been available to him for remodeling or sale, or even that the structure might be razed. Unless its condition could justify its condemnation by lawful authority, his should have been the option as to future use of the property.

It is difficult for me to understand how this court can sustain so studied a deprivation as has here occurred.

7. And with the results in riot-torn Washington so painfully obvious the prospect now being opened up may seem horrendous indeed, whether the "violations" were committed by the tenants themselves or by others whose conduct created conditions with which the landlord must cope. I cannot accept the premise that Congress even remotely entertained any such "intent" as my colleagues so confidently proclaim.